ELIZA R. P. CHRISTIAN, AN INCOMPETENT PERSON, BY HERMAN V. VON HOLT, HER GUARDIAN, *v.* WAIALUA AGRICULTURAL COMPANY, LIMITED, AN HAWAIIAN CORPORATION, AND JAMES L. HOLT.

No. 1920.

ARGUED FEBRUARY 2, 3, 4, 1931.          DECIDED APRIL 18, 1931.

PERRY, C. J., BANKS AND PARSONS, JJ.

818

OPINION OF THE COURT BY BANKS, J.

This is a suit in equity brought by Eliza R. P. Christian, an alleged mental incompetent, by her duly appointed guardian, for the cancellation of a deed of conveyance of a contingent interest in land situated on the Island of Oahu, and for other incidental relief. The circuit judge before whom the case was tried entered a decree canceling the deed so far as it related to the petitioner and as incidental relief decreed that the Waialua Agricultural Company, one of the respondents, pay to the guardian of the petitioner the sum of $540,906.07. The Waialua Agricultural Company brings the case here on appeal from the decree.

The deed in question was executed by the petitioner at Oxford, England, on May 2, 1910, the grantee being James L. Holt, a respondent in the instant case. At that time the petitioner, by virtue of the will of her grandfather, R. W. Holt, long deceased, and by virtue of her being the only surviving child and prospective heir of John Dominis Holt, who was then living, and who under the will of R. W. Holt was given a life estate, was the owner of an estate in remainder in an undivided one-third interest in the lands described in the deed. This interest passed by successive conveyances from grantor to grantee until on July 20, 1921, it came finally to rest in the Waialua Agricultural Company, where it remained unchallenged until May 8, 1928, when the present suit was brought.

On April 10, 1922, John Dominis Holt, the life tenant,

died leaving surviving him as his sole heir at law his daughter, Eliza R. P. Christian. Upon the happening of this event Eliza's contingent estate in remainder ripened into a vested estate in fee simple. The deed executed by her on May 2, 1910, purported to convey to James L. Holt, the grantee, not only the interest which she at that time had but also purported to convey every interest which she might thereafter acquire under the will of R. W. Holt. If this deed was valid and binding on her it divested her of all interest in the property, whether present or prospective, and vested it in her grantee and by subsequent conveyances it became the property of the Waialua Agricultural Company.

The question therefore that lies at the very threshold of the case is whether Eliza Christian, at the time she executed the deed of May 2, 1910, had sufficient mental capacity to make a valid and binding conveyance of her interest in the lands described in the deed. This is a question of fact, upon which much conflicting evidence was taken. The circuit judge made the following findings regarding the petitioner's mental competency: "Upon the weight of the testimony and the credibility of the witnesses, as herein summarized in connection with the question of competency, the court finds: 1. Eliza (Holt) Christian, petitioner, neither was, nor is, an idiot, a lunatic or *utterly* imbecile. 2. She was and is, however, a person of undeveloped intellect, incapable of forming a reasoned judgment or understanding, incapable of comprehending her own right to an independent status, the extent or nature of property or of her property interests, the value of money, or the ordinary matters of life essential to a reasonable degree of independent living. 3. She had insufficient mental capacity to comprehend the difference between $100.00 and $1,000.00; between $30,000.00 or $60,000.00 for her individual rights; or to comprehend

the difference between payment to her individually, for her sole disposition, of any such sum or sums and payment to her circle of relatives and under their control; or whether $30,000.00 or any sum was for her rights as distinct from the rights of others involved in the deal; or the difference between present payment of income and future payment of principal; or to understand that she had rights distinct and independent of her father or of Annie Kentwell. 4. She could not possibly have comprehended, even with advice worthy of trust, the elements necessary to form an independent judgment or to exercise a reasonable measure of choice or of will relative to the value of cane land, pineapple land, ranch land or any kind of land in any quantity; or of postponed rights therein as opposed to present interests; or even the elementary character of her rights and direct the disposition of what she owned. 5. The court is convinced that Eliza did not have the most elementary capacity to understand and judge her rights and protect herself from undue influence and fraud; and that at no time was she an independent actor with a knowledge of her rights. 6. In short, she was mentally incompetent to execute a conveyance in 1910 or at any other time within the scope of the evidence and the law in this case."

It has long been the rule in this court that "in equity cases, on appeal, while the findings of the circuit judge are given weight and under certain circumstances, especially on pure issues of fact, would be allowed to control, the supreme court nevertheless is authorized and has always exercised its right and duty to weigh the evidence and to make its own findings." *Godfrey* v. *Kidwell,* 15 Haw. 526 (1904). See also *Cha Fook* v. *Lau Piu,* 10 Haw. 308 (1896).

In compliance with the duty imposed upon us by law we have carefully read the entire transcript of the evi-

dence, consisting of some three thousand typewritten pages, bearing upon the petitioner's mental condition, with the view of determining whether she was incapable of making a valid conveyance of her interest in the lands in question. We have weighed this evidence to the best of our ability and from it have reached the conclusion presently to be stated.

Of course a deed to land executed by a person who is *sui juris* is presumed to be valid and will not be upset because of the mental incompetency of the grantor unless the incompetency was of so marked a degree as to be the equivalent of a lack of capacity to make a binding contract. The highest degree of intelligence is not necessary to bind the grantor, nor is the lowest degree essential to the avoidance of the deed. Between these extremes lies the fate of the deed. In Black on Rescission and Cancellation, § 262, the following rule is given: "No particular degree of mental capacity is essential to enable one to execute a valid deed or contract, and no arbitrary standard is or could be established. No very high measure of intelligence or acumen is required, and on the other hand, a person may be mentally incompetent for business and legal purposes although he is not absolutely an idiot nor totally devoid of reason. The test generally agreed upon is this: A deed or contract cannot be set aside on the ground of insanity if the person had sufficient mental capacity to understand in a reasonable manner the nature of the particular transaction in which he was engaged and its consequences and effects upon his rights and interests. It is sometimes said that a person has capacity to make a deed if he has sufficient mind to be capable of transacting ordinary business affairs, or of pursuing his own ordinary business in his usual manner. But this is too loose. The proper inquiry is whether he was capable of understanding and appreciating the nature and effect of the one particu-

lar act or transaction which is challenged. 'It is evident that it requires less capacity to do a simple act, or make a contract involving no complications, than it does to make understandingly an agreement involving complications and imposing various obligations. One may have but little business capacity, and a weak intellect or impaired faculties, and yet be capable of making a binding contract. All that the law requires to make the contract effectual is that a man should so have possession of his reason as to know the character of the act he is about to perform and be capable of carrying that act into effect." In *Mann* v. *Keene Guaranty Savings Bank*, 86 Fed. 51, 53, the circuit court of appeals for the eighth circuit, in discussing the capacity of a grantor to execute a deed, announced the following rule: "The question is not whether her mental powers were impaired. It is not whether or not she had ordinary capacity to do business. It is whether she had any—the smallest—capacity to understand what she was doing and to decide intelligently whether or not she would do it." The respondent characterizes this as "a classic statement of the law upon the subject in the federal courts."

With this test in mind we will review the evidence with such fullness of detail as seems necessary to an adequate understanding of this phase of the case. In doing this we will consider the evidence which reflects Eliza Christian's mental condition at different periods of her life.

Eliza Christian (at that time Eliza Holt) was born December 30, 1885, at Makaha, which is a rural section of the Island of Oahu. In the early nineties (perhaps 1893) she was brought to Honolulu. In 1894, when she was about eight years of age, she was placed, as a pupil and boarder, in school at the Catholic convent in Honolulu. She remained in this institution until July 1, 1899.

After leaving the convent school and after a year's interval in Honolulu she went in 1900, with her cousin, Annie Holt, to San Jose, California, where she attended a Catholic girls' school at Notre Dame convent. In the summer of 1901 she returned to Honolulu and for a time attended school at St. Andrew's Priory. She left this school before completing the term. Thereafter she remained in Honolulu until 1906 when she went with her father and cousin, Annie Kentwell, nee Holt, and the latter's husband, Lawrence Kentwell, to the mainland of the United States. In 1909 she went, again with her father and the Kentwells, to Oxford, England, where she was living in 1910, when the deed in question was executed. Since the execution of the deed she has continued to live in England, residing, except for about four years in London, with the Kentwells at Oxford.

The evidence relating to Eliza's mental state during the first period of her life, that is, during the time she was living at Makaha, is rather scant. Several of the witnesses who saw her from the time of her birth up to the time she came to Honolulu with her father, and who had observed her as a child playing with other children, testified that she was not different from her associates and seemed to be entirely normal. Typical of this testimony is that of Keawekane, his wife, Kaluna Keawekane, Solomon Keaupule, and two or three other Hawaiians who worked on the Holt ranch. Keawekane testified that he had opportunity to observe Eliza from the time she was a very little girl until she grew up to be a big girl and that there was no sign that she was "ihepa," "lolo" or "pupule," and that there was nothing unusual about her to attract his attention; that she was like other people. His testimony was corroborated by his wife, Kaluna Keawekane, and the other witnesses just referred to. The testimony of Mrs. Helen Cushingham, however, gives a very different

picture of Eliza's mentality during this period. Mrs. Cushingham went to Makaha in 1886, about a year after Eliza's birth. During the time that Eliza and her father were there she lived within a very short distance of them and frequently saw Eliza up to the time she finally came with her father to Honolulu. There was no school in the neighborhood and Mrs. Cushingham not only taught her own children but also undertook to teach Eliza, who was about two or three years older than Mrs. Cushingham's eldest child. "I tried to teach her the alphabet and numbers and I found that she was a hopeless case;" that she was never able to learn her alphabet nor to learn anything about numbers and was not able to carry on a sensible or rational conversation. There is also testimony of other witnesses who knew Eliza during her early childhood which corroborates that given by Mrs. Cushingham. For instance, Mrs. Abbie Zablan testified that she remembered Eliza at Makaha when she was five or six years old. She saw her there on several vacations and that she was "simple." "If you call her and say 'hello' to her she won't talk to you; can't get anything from her." She was "simple like,—ihepa. * * * When you talk to her she doesn't say anything and grinning like that. * * * Q By 'ihepa' what do you mean? A Simple-minded." Mrs. Marie Aylett testified that she first knew Eliza in 1886 as a babe in arms and that from the first time she knew her she did not have that normal appearance like other normal children. "She was always funny, very silly. * * * She was a feeble-minded child,—not normal." Speaking of the time when Eliza was between three and four years of age the witness testified that she tried to teach her "just a few objects, such as 'chair,' 'table,' and I would make a statement for them to repeat. The others would do it but she can't. She would laugh and go out and spin around." She never played with toys or dolls or marbles.

During the second period of Eliza's life, which includes her pupilage at the Catholic school in Honolulu, her contacts were much more numerous and frequent than during the first period, consequently the evidence portraying her mental condition is more voluminous. Many of the witnesses who testified concerning Eliza, her habits, her personality and her progress during this period were women who as young girls attended the school during the time she was there, or a portion of the time she was there, and who knew her more or less intimately and observed her more or less closely. There is some conflict in the testimony of these witnesses. In a general way, however, some of it tends to show that Eliza in her companionship with other pupils and her behavior in school was not unlike her associates. The testimony of Mrs. Minnie Paloney illustrates the tendency of this testimony. This witness attended the school for about a year and a half, during which time Eliza was also a pupil. She remembered that during the play period Eliza engaged in the same games and in the same way as the other girls. She was very polite and never quarrelsome. She had drawing lessons and sewing lessons and did her work like the other girls. The witness had seen her read, knew she dressed herself and generally took care of herself. Her table manners were always good. Basing her opinion on the acts which Eliza did in her presence and her conversations with her the witness said that she was just like the other girls. She played with them and talked with them and would do everything the other girls would do. She knew little or nothing about Eliza's progress in school or her proficiency in her studies. Mrs. Fisher, who was a schoolmate of Eliza's during the period we are now considering, testified more in detail and more positively as to her mentality. According to her recollection she was entirely normal—in her studies, her habits and her associations

with other pupils. She took communion, attended confession, memorized the catechism and recited her lessons. She also wrote in the witness's autograph album. Mrs. Fisher testified that she and Eliza were in the same class, beginning with the primer, were promoted together, ending finally in the third class. Mrs. Beatrice Ross testified that she and Eliza were at school together for about five years. Her testimony is not so specific as Mrs. Fisher's but tends to show that she was a normal girl. There were several other witnesses who testified to the same effect.

In sharp contrast with this testimony is the testimony of the Catholic Sisters who were connected with the school during Eliza's attendance. Sister Anne Joseph testified that she remembered Eliza Holt at school very well. She was there about six years. She could not make any progress in her studies. The witness was with the Sister who was teaching Eliza but she could not learn. She was taught reading but she could not be promoted. She was not an idiot and she was not insane. "She acted like a little girl, a little child, a girl playing with little ones in the school. She was very polite; had a kind heart * * * would say 'good morning, Sister,' * * * 'good afternoon, Sister,' * * * and 'thank you.' * * * She sat there. She could not recite by heart, she could not memorize words like that." The witness never saw her take communion. Sister Mary Augusta testified: "I saw the father bring her" (Eliza) "in school. I asked her if she wanted me to talk to her, because she was kind of silly. * * * Only to see her you could tell there was something the matter." This witness further testified that Eliza was like a little child in school. She never learned anything. She was in school four or five years but never learned anything. She could repeat words after the teacher but the witness thought she could never remember. The witness also thought she "never wrote." When asked if at the

time Eliza left the school she had progressed any the witness said: "No, no, just the same. She never learned anything." Sister Teresa testified that she was a pupil in the school when Eliza was there and that she and Eliza were playmates; that they were together in school about two years. When asked to describe her the witness said: "She really couldn't learn, she was not able to learn. She was easily influenced and she had a very kind heart and you could easily influence her. She often spoke about her cousin Annie. I think she was of that spirit that had a mind that could not be really developed,—a kind of small child. * * * She must have been maybe about eleven or twelve." She was then asked the question: "And you would describe her as having the mind of a small child?" and her answer was: "Yes, not able to be developed." Sister Leocadia testified that while Eliza was at the school she had an operation on both eyes and that she (the witness) nursed her after the operation. She said Eliza talked with her "a little, but not very sensibly; like a little child." Sister Margaret testified that she knew Eliza but was never her teacher; that she remembered that she was not like a normal girl as to her mind but she was put in a class with bigger girls "because we couldn't leave her with the small children all the time." Sister Regoert testified that while she had nothing to do with Eliza she knew her well and that she had a childish mind. "If you tell her to do a thing and she would not. She cannot judge for herself what was right and what was wrong, but she was never unpleasant or difficult to manage." The witness did not remember what she had to do with Eliza but remembered that she had something to do with her and that her eyes were crooked. She remembered that she was a "small child when she was big."

The third period of Eliza's life comprises the time (about a year) when she was a matriculant at a Catholic

girls' school at Notre Dame convent in San Jose, California. There is not much evidence concerning her during this period. Mrs. Rose Wight (nee Cunha) testified that she was a pupil at Notre Dame during the time that Eliza was there. She knew her quite well and took frequent walks with her in the garden. The witness thought Eliza was then about fourteen years of age and that she was not in the first grade but in a sort of infants' class before the first grade. When asked what she had observed regarding her ability to read, the witness said: "On many occasions—probably it will need a little explanation. I was rather fond of the children and it was our custom to take walks during recreation time. We had school hours so long we had to walk in the garden, and very often I would ask Eliza to walk with me, and on many occasions she would read me her lessons. When she had a successful day she seemed very happy of accomplishment." She did "very simple reading of four and five words, but she felt she was accomplishing something and was anxious to let me see." When asked to describe the kind of girl Eliza was with reference to mentality, the witness replied: "Of course I don't really think I am capable of judging but from a lay-person's viewpoint I would say she had the mind of a child of six." Speaking of the kind of conversations they had, the witness said: "Conversations that would suit a child of six. She seemed to be a little child and I liked to go out and talk with her about things that would interest her, things about the garden and about animals, things that would make an interesting story."

After returning to Honolulu from Notre Dame Eliza Christian entered St. Andrew's Priory as a pupil. During her pupilage there it was discovered that she was pregnant and she was obliged to leave the school before the completion of the term. Mrs. J. J. Smiddy, who was at St. Andrew's Priory during a portion of the time that

Eliza was there, testified that she knew her and had occasion to observe her among other girls. When asked what impression Eliza made on her she said: "Well, she was a girl that gave me the impression of being below the normal,—feeble-minded." When the witness spoke to her "she didn't respond at all, just hung her head, or just act foolish, you know." When asked if she remembered what class Eliza was in she said: "No I can't tell you. I know she was not in any particular class, because she never would attend classes very well. She was not a very bright child and I don't think she was ever made to study there, or she could not." The witness remembered that she played a lot with the younger children, children about "seven,—five, six or seven;" could not remember just how old she was—thought perhaps "eight, nine or ten." Mrs. Daisy Sanders testified that she knew Eliza at St. Andrew's Priory and that she was about fourteen or fifteen years old at that time—that she thought she (Eliza) was in the "baby class." When asked what Eliza's condition was as she remembered it, the witness said: "Well, most people would—the new name for it now is 'feeble-minded,' but we used to call her feeble and stupid, the girls in school used to. * * * She didn't want to mingle with the girls, and if you asked her anything she didn't know what to answer you, whether to say 'yes' or 'no;' kind of timid. * * * Sometimes she would answer and sometimes she wouldn't as if she didn't know." Sister Lydia Margaret, whose deposition was taken in Glendale, Ohio, testified that she had formerly lived at St. Andrew's Priory in Honolulu, having substituted as a teacher; that while she was there she knew a girl then attending the priory named Eliza Holt but that she never had occasion to teach her. She did, however, have occasion to observe her during the period she was at the priory. She had no recollection what class or grade she was in; did not know whether she was

ever promoted. When asked if she remembered whether Eliza carried on a rational or sensible conversation with her or with anyone else in her presence, the witness said: "No, she didn't. She was kind of feeble-minded. * * * She was very childlike all the time, different from the other girls. * * * She was mentally deficient. Miss A. Z. Hadley testified that she had been teaching at Lahaina and came to Honolulu to spend the Christmas holidays and had to remain, on account of the plague, until the Easter holidays; that during this time the priory was practically her home and that she was there for about four months and saw Eliza Holt—that she was sure she would have noticed it if she had not been normal.

Eliza left St. Andrew's Priory probably in the early part of 1902—certainly before April, because in that month she gave birth to an illegitimate child. From the time she left the priory until she departed in 1906 with her father and her cousin, Annie Kentwell, and the latter's husband, Lawrence Kentwell, for the mainland of the United States, she lived with relatives and friends in various sections of Honolulu. This constitutes the fifth period of her life. During this period many things of importance to Eliza transpired and the state of her mental capacity with reference to them and otherwise is revealed by the testimony of many witnesses.

As we have just seen, her child was born in April of 1902. On May 27 and 28, 1902, she testified as the complaining witness in a rape case. On June 12, 1902, she appeared in court with her father, John D. Holt, and Mr. and Mrs. George Sea, and signed an agreement for the adoption of her child by the Seas. On January 26, 1903, she was married at the Catholic Cathedral to Albert Christian, with whom she lived for a short time, probably six months, and from whom she was never divorced. In the latter part of 1903 proceedings were brought in the cir-

cuit court at Honolulu to annul her marriage. On January 24, 1904, her child, which had been adopted by the Seas, died. On March 4, 1905, Judge Gear handed down his decision denying the petition of Annie Kentwell for the annulment of Eliza's marriage. On March 17, 1905, Eliza consented, over her own signature, to a lease that had been executed by other parties in interest of the Holt lands at Waialua to the Waialua Agricultural Company for a period of twenty-five years from April 1, 1905. On August 31, 1906, she executed a written instrument assigning to Annie Kentwell all her (Eliza's) income and profits from the Holt estate, including rents under the Waialua lease just referred to, during the life of Eliza, in consideration of Annie Kentwell's agreement to support her during that time. On the same day Eliza leased to Annie Kentwell certain interests in land at Makaha.

Mrs. John H. Wilson, the wife of John H. Wilson, who was, at the time her testimony was given, mayor of the City and County of Honolulu, gave this picture of Eliza when she was in an advanced state of pregnancy: "When she was pregnant, one Sunday I was going with my mother to church, and just out here, at the old Opera House we had before, past that was the old Gibson home, and she was sitting out with a couple of boys playing marbles. Of course she couldn't stoop and sat flat on the ground, and I said, 'Eliza, what are you doing here?' and then the boys started to run with the marbles and she started to cry, just like a child, and I called to them and they brought them back when I called, and I said, 'How many marbles have you here' and she said, 'I don't know.' * * * They didn't give back all the marbles, but they ran, and that is all she got." In answer to the question, "Was her condition of pregnancy noticeable at that time?" Mrs. Wilson said, "Oh, yes." This witness also testified that she knew Eliza when she was four or five years old—saw her fre-

quently.when she and her father would come to Honolulu and that she also saw her often after she and her father moved to Honolulu, and after her marriage to Albert Christian she saw them once in a while, passing them on the street. She remembers seeing Eliza at the court house during the proceeding to annul her marriage and she also remembers seeing her when she lived with the Kentwells at Waikiki just before their departure for the mainland. The impression she got of her during all the time she knew her was that she was feeble-minded—what the Hawaiians call "ihepa." She never at any time heard Eliza carry on a sensible or rational conversation.

Mrs. Hilda Chillingworth, testifying in regard to Eliza's pregnancy and her actions at that time, said: "Of course, we didn't realize what the trouble was. We used to make fun of her a great deal, never realizing, of course, that she was going to have a baby, but she would play around with us just the same and went around as though there were nothing the matter with her. * * * I don't think she realized what was going to happen." Mrs. Chillingworth also testified that her earliest recollection of her was when she (Eliza) was about twelve or fourteen years of age. They lived on adjoining premises and while never intimate were friendly and played together a great deal. When asked to state what kind of girl she was and her condition, the witness said: "It is very hard to state, except our impression of her at the time was that she was just simple,—simple-minded." She imagined the Hawaiian word would be "lolo." "In playing games we would always take advantage of her. In playing hide we would make her seek and let her keep on looking, and we would play marbles with her and we used to take them away from her." When asked if Eliza would know how many marbles she would have at any time, the witness said: "I don't imagine so. It seems to me we would give her a few

or whatever we had and she would be satisfied—I don't recollect."

Mrs. John Lopes knew Eliza when she was ten or eleven and again when she was seventeen or eighteen years old, and when asked if she remembered anything about her just before her baby was born, said: "Yes. * * * I do. I called to see Mrs. Holt and old lady Holt, and the girl in her condition I saw climbing over the —jumping from the chiffonier to the bed, and the day I was there I said, 'Don't do that in the condition you are in' and she only laughed at me and jumped up on the chiffonier and I said 'In the condition you are in you are not supposed to do that' and she only laughed at me."

Mrs. Marie Sea, one of the adoptive parents of Eliza's child, testified that Eliza had come to her house on Piikoi street about six weeks after her baby was born and that she thereafter lived with her for six or seven months. Speaking of the time when the baby was adopted the witness said that she and Mr. Sea, and Mr. Holt and Eliza went before the court and the judge told Eliza "that she was giving her baby to me; that it wasn't hers any more;" that Eliza did not read over the paper which she finally signed. The witness had never at any time heard her read anything and had never seen her reading anything; also had never seen Eliza write anything aside from her name. When asked whether she took care of the child Mrs. Sea said: "She could not care for the child unless someone told her what to do. She did not know when to feed it, when the child needed feeding; how to change it. I looked after that." When asked about Eliza as to her dress the witness said: "Well, if you had let her alone, she would not care to change or clean herself. She was very helpless. * * * Sometimes she would have her clothes inside out and the buttons inside. She would wear them

that way unless I noticed it. *. * * She was an imbecile to my way of thinking,—lolo.".

At the trial of the rape case already referred to, Eliza was brought forward as the prosecuting witness. At that time she was about seventeen years. of age. Her answers to the questions propounded to her give a clear picture of her mentality. Most of the questions were leading and were answered "yes" or "no." She seemed to have a fairly good knowledge of the streets in the neighborhood where she lived and the location of buildings. When questions were asked her which could not be answered "yes" or "no," her replies were often quite confused and sometimes unintelligible. She seemed unable to tell with any sort of definiteness just what the accused did to her. From her replies to many leading questions, in which the answer was palpably suggested, an inference of sexual intercourse might be drawn, but nothing more. When asked why she did it or let him do it she replied, "I don't know." On cross-examination on simple matters her answers often were "I don't know" or "I don't remember." At first she did not know whether it was right or wrong to have sexual relations with a man before marriage. Later she said it was wrong. She did not know why she was in court or who was the father of her child. In her testimony she accused two different men. After adjournment of court to the next day she was again called to the witness stand and materially changed her story. At the conclusion of her examination she was cross-examined as to her ability in simple arithmetic. When asked how many seven apples and five apples would make, or how many fingers she would have with seven on one hand and five on the other, or how many two apples and two apples would be, or what five times four would be, she did not answer but shook her head, indicating that she did not know.

Eliza's testimony is comprised within seventy-nine

typewritten pages. It would be a wearisome and useless task to review it in detail. Suffice it to say it clearly reflects a very rudimentary and undeveloped mind.

Many witnesses other than those already referred to testified to their acquaintance with and their observations of Eliza during and prior to this period. While there is not entire unanimity of opinion among these witnesses concerning her mentality during the period we are now considering, a great majority of them regarded her as either "simple-minded," "ihepa," "lolo," or "pupule." The opinions of these witnesses were predicated upon her acts and behavior at various times which are inconsistent with a normal mind, such acts and behavior being inability to carry on a "sensible" or "rational" conversation; associating with "small children;" inability to do simple domestic work like "cooking," "making beds" and "sewing;" inability to take proper care of herself in matters of "dress" and "personal cleanliness" without direction; inability to "read" or "write" except to sign her own name; inability to "count" except to a limited degree; inability to "recite the alphabet" beyond the first few letters; often "grinning" and "running away" when spoken to, and yielding to the calls of nature in broad daylight on public streets in the presence of others.

"Ihepa," "lolo" and "pupule" are Hawaiian words in common use in this Territory and are descriptive of a person having a diseased or insane mind or of one having an undeveloped mind or of one who is in a condition of imbecility or idiocy. They all, however, indicate a state of mental incompetency arising from one cause or another.

Among the witnesses who considered Eliza normal during this period are Mrs. Ellen K. Lorenzen, a probation officer, Mrs. Eliza Yates McKenzie and Lorrin Andrews, an attorney at law.

Mrs. Lorenzen testified that as a probation officer she

had worked with feeble-minded children and had observed how they acted. She first knew Eliza in about the year 1903 and saw her from time to time thereafter around Honolulu. She had come in contact with her in the home of her sister, Mrs. John Holt. When asked her opinion of her during the time she knew her, the witness said: "She always impressed me as being a very timid child." And when asked whether in her opinion Eliza was either "feeble-minded," "ihepa," "lolo" or "pupule," Mrs. Lorenzen said: "She" (referring to Eliza) "seemed to understand my sister, and when she would talk to her she would answer, and she was neat and clean." On cross-examination the witness was asked if she had not stated to Mr. Hite (one of the attorneys representing the petitioner), in the presence of John Holt, that she had always considered Eliza to be "lolo." Her answer to this question was: "No, I don't remember that." Holt, who testified in rebuttal, stated that he remembered a conversation during which Mr. Hite and Mrs. Lorenzen were present and that Mrs. Lorenzen said: "You, Johnny, know as well as I do that Eliza Holt was lolo. They called her ihepa and feeble-minded. Don't you think so?"

Mrs. Eliza Yates McKenzie, seventy-two years of age, who testified from her sick bed, stated that she used to visit, for three or four weeks at a time, in the Kentwell home at Waikiki, while Eliza was staying there; that she considered her perfectly sane, "there was nothing wrong with the girl. She was nurse girl, the woman that cleaned the house; that sewed the clothes, and I never saw anything out of the way with her. * * * I used to sit on the veranda and talk with her nearly all morning, sometimes, and she seemed to me perfectly rational." The witness did not know whether Eliza could read—that she was kept too busy to have an opportunity to read, but she could "sing Hawaiian lore, Hawaiian songs * * * 'Like

No A Like.' * * *. She had a sweet voice." She stated that Eliza used to cook and serve the meals; take care of the children when the Kentwells went out; go swimming from the Cassidy pier. She did not know that she had given birth to a child; did not know anything about her marriage to Albert Christian. The witness remembered Mrs. Kentwell's having whipped or beaten her because she (Eliza) refused to marry George Kentwell.

Dr. James R. Judd, who was called by the petitioner in rebuttal, testified that he had for many years been the physician and attendant upon Mrs. Eliza Yates McKenzie. When asked for his opinion as to her mental state, Dr. Judd said: "She is 72 years old and has had a great deal of illness, and at the present time she is confined in bed, and has been in bed for several months with a broken hip. It is common with old people. She has a good memory for past events at times, a very active memory. Of recent events her memory is not as good. That is a matter which is common with old people. I have never made any special observations as to her memory. I am not a mental expert. I could not give any scientific summary of her mental condition unless things were checked up. For instance, she might repeat a thing accurately and the next time subsequently alter it in some way, but considering her age and her illnesses I should say that she has a fairly good memory, at times confused, uncertain, and unreliable."

Lorrin Andrews, who is a member of the bar of this court, having been at one time attorney general of the Territory and who for the past few years has resided in Los Angeles, testified that during his residence in Honolulu he knew all of the members of the Holt family, including Eliza, whom he knew as a girl; that he was a frequent visitor at the Holt home and saw her on a number of occasions; that after she had given birth to an illegitimate child and had charged a white man named Hall with hav-

ing raped her and when Hall was about to be tried on the charge of rape, Lawrence Kentwell called on him and told him that his brother, George Kentwell, was about to be mixed up in the matter, and that as a result of this conference he interviewed Eliza. Speaking of this interview the witness said: * * * When I told her I was representing George Kentwell, she talked very freely and she said to me that she had testified before the grand jury, I believe under the advice of Annie Kentwell. She said Annie Kentwell, as I remember it, was a daughter of Owen Holt and, I guess, her cousin,—yes, the daughter of Owen Holt, and her cousin." In answer to the question as to what she said to him during this interview the witness stated that Eliza said in substance that "at the instance or advice of Annie Kentwell she had said that Hall was the only man who had ever been intimate with her and was the father of her child; that she had fixed the alleged rape at an unfinished house that Hall was building; that she had got mixed up in her dates; that it turned out that the house had been finished more than a year before her child was born and she was very much worried over it as to what would happen to her when she got in court and they confronted her with these witnesses. She asked me what she should say, and I told her, 'I am not your lawyer; I am not going to give you any advice. The only thing I can say is, if you come into court you had better tell the truth. That is the safest way to do.' And she went on—portions of the conversation I remember—she went on whether they would put her in jail * * * for having lied, and she began bringing up different things that she wanted advice on, and Annie Kentwell said, 'Well, Eliza, play lolo, play lolo; that is all you have got to do,' and when that came I thought it was about time for me to retire from the scene, and I retired. * * * I don't remember ever having talked with Eliza Holt after that

date." In answer to a question as to how the girl impressed him the witness said: "There is no question. She was perfectly rational, if that is the test;" that he noticed no impediment in her speech but that she spoke very slowly; that so far as speech was concerned she was "normal for her class and age." The witness also testified that he heard Eliza testify in the Hall case and that she was entirely different; that by the comparison he would make, she was at the trial either "very much frightened or acting."

As we have already seen, Eliza went in 1906, with her father and the Kentwells, to the mainland of the United States, remaining there until 1909 when they removed to Oxford, England. This constitutes the sixth period of Eliza's life. At the beginning of this period she lived with her father and the Kentwells, first at Cambridge, Massachusetts, for a few months, and then at Elizabeth, New Jersey. On June 13, 1907, Eliza appeared before Edward L. Mack, commissioner of deeds of New Jersey, and acknowledged that she had signed, sealed and delivered her written confirmation of a lease made by John D. Holt, Jr., and others on January 1, 1901, to Annie Holt Kentwell. On June 14, 1907, she appeared before E. L. Bernard, notary public, New York County, and acknowledged the execution of an option to May K. Brown for the purchase of her contingent interest in lands at Makaha. On October 26, 1907, she again appeared before Edward L. Mack, notary public of New Jersey, and acknowledged the execution of a quitclaim deed to certain lands situate at Kaaawa, Makua, in the County of Oahu, and Territory of Hawaii, to L. L. McCandless. On January 1, 1909, she gave birth to another illegitimate child in the city of New York.

Elizabeth Martz, a resident of Elizabeth, New Jersey, for about thirty years, testified that she knew Eliza be-

tween "1906 or 1907, or 1908" and that she lived next door to her for "about three or four years or more;" that during that period they had talked to each other "about once a week,—maybe more;" that Eliza was "a short and dark lady, appeared to be a Jap. * * * She looked just like a Jap, that is all I can say." Their conversations were "just general things;" she was "all right. She seemed to be—she was sane. * * * She was rational." The witness saw no indication of temper on her part, "she was all right in every way;" she (Eliza) was about twenty years old, "I suppose," at that time. She "guessed" Mrs. Kentwell was also a "Jap,"—all the members of the family living there appeared to be Japanese. When asked if she was on intimate terms with this Japanese family next door —whether she called on them and visited with them a great deal, the witness said: "Well, no, just occasionally, that we had milk for sale, and when they were short they would come in and get the milk and so, and then out they would go." When asked if she and the members of this family called on each other particularly, she said: "No, just as a neighbor, we just spoke as neighbors would do, you know—a few words and that." She never visited the home, or had meals with them or anything like that. She knew nothing about Eliza's habits about the house. She knew nothing about her ability to take care of herself. She never saw her write anything; she never saw her read anything. She never saw her handle money. She never had occasion to see whether she could add or subtract. Eliza never had any money. She did not know that Eliza had an illegitimate child while she was living there. When asked if during the time she lived next to her she ever noticed that Eliza was pregnant she said: "Well, you see, we were busy, and I hadn't much chance to gaze around, and as I say, we were out with the milk wagon, we would come in in the afternoon, and then we were too busy—

we didn't visit with no neighbors or anything. I didn't notice anything, no." She did not see a great deal of Eliza —"just occasionally—just as I say, maybe probably once a week and maybe. more, and she would come in maybe once or so to get milk."

Edward L. Mack testified that on June 13, 1907, "someone who was introduced to me as Eliza R. P. Christian" appeared before him and personally executed the confirmation of the lease to Annie Kentwell just referred to and that he took her acknowledgment in regular form as commissioner of deeds; that he explained to her the contents and purpose of the instrument and asked her if she executed it freely and voluntarily and that she answered in the affirmative. When asked if he could recall anything with respect to Eliza's appearance and conduct at the time he said: "I have not a very clear mental picture of her, except that as I recollect it she was a woman of approximately my own age, and rather small and not attractive. There was nothing in her appearance or manner that impressed her upon me very strongly." The witness could not remember anything that she did or said that would lead him to suspect that she was not of sound mind. The witness was also shown a certified copy of the deed from John D. Holt and others to L. L. McCandless, dated October 26, 1907, and said that the original of this instrument was executed in his presence as a duly authorized notary public for Union County, New Jersey, and that John D. Holt and Eliza Holt Christian signed it in his presence; that he explained to Eliza the contents and purpose of the instrument and asked her if she executed it "for the uses and purposes therein expressed, freely and voluntarily and without any constraint, compulsion or fear on the part of or from her said husband," and that she answered in the affirmative. When asked if he had any other conversation with Mrs. Christian and Mr. Holt on that occasion he said:

."My recollection is that following the execution of that instrument I asked them if their former home was in Hawaii. We talked for two or three minutes about the Island." When asked if Eliza's acts or conversations were those of a rational or irrational mind, he said: "All I can say is that there was nothing in her appearance or in anything she did or said which led me to suspect that she was not of sound mind." From the two meetings he had with Eliza he said: "I think she was normal. I would rather answer that by saying that I do not remember anything she did that would lead me to think she was not normal. * * * In other words, I am trying to convey now that there was no reason for me to scrutinize Mrs. Christian with the idea of seeing whether she was sane or not. She did not give the slightest evidence of not being perfectly all right." He was testifying to facts which occurred twenty-one years before, when he was twenty-six years old. It was the first time he had ever been called upon to take an acknowledgment to a deed covering land lying outside of the United States and for that reason alone he could explain why he could remember, when he was taking so many acknowledgments. He had never seen Mrs. Christian before the 13th day of June, 1907, and the 26th day of October, 1907, nor had he ever seen her since. In taking her first acknowledgment he did what he usually did, that is, asked her questions in the usual form and got an indication of affirmance and that her part in the conversation was to indicate her affirmance. Speaking of the conversation regarding Hawaii, that occurred on the taking of the second acknowledgment, he said: "My recollection is that the conversation was almost entirely between Mr. Holt and myself."

Everett L. Bernard testified that he was an attorney living at New Rochelle, Westchester County, New York, and that he had been a notary public authorized to take

844

acknowledgments in the city, county and State of New York and that he was such notary public on June 14, 1907. He was shown a certified copy of an option of Eliza R. P. Christian to May K. Brown, purporting to be dated the 14th day of June, 1907, and was asked whether the original of that instrument was executed in his presence, to which he replied : " "I believe it was, yes, to the best of my knowledge;" it was signed by Eliza R. P. Christian on the date of the acknowledgment in New York County. "After she signed it, I asked her if she acknowledged it, and I followed the wording of the acknowledgment which was a little bit unusual—whether she acknowledged it freely and voluntarily for the uses and purposes therein set forth" and "she said 'yes' or replied in the affirmative. I think she said 'yes;' " that no one prompted her to give that answer. · The witness was also shown a certified copy of a deed by Annie H. Kentwell and husband, et al, to May K. Brown, purporting to be dated June 14, 1907, and was asked whether or not the original of that instrument was executed in his presence to which he replied : "Yes, * * * by Annie Holt Kentwell and L. K. Kentwell, and Eliza R. P. Christian * * * in New York County" on the date of the acknowledgment; that he asked Mrs. Christian if she acknowledged the execution of this instrument and "my memory is she said 'yes' " and when asked if anyone prompted her in making her signature he said "no." The witness had seen Mrs. Kentwell and Eliza on one other occasion prior to the signing of the deeds. When asked to state what conversation was had between any of the persons present upon the occasion of his first meeting with Mrs. Christian the witness said : "I do not remember the exact conversation, other than a discussion of the trans- action. * * * I recall I addressed a remark to the group, inquiring of them the reason for the reservation of a parcel which was reserved in the option; and one

of the three replied that it had a patch of some fruit or vegetable they desired to retain; and the other two nodded an assent to that; it was unanimous. That is the only particular conversation I recall." Speaking of the time when the acknowledgments were taken, the witness said: "My memory groups the two women in my mind. Neither of them stands out distinctly from the other. They were both alike and at the time I had been told, I think, that they were related. * * * The demeanor of both was ladylike and pleasant and normal in every way." When asked particularly about the appearance or conduct of Mrs. Christian on the date of his first meeting with her, the witness said: "I am not positive that my meeting on June 14th was not my only meeting with her. If I met her at the first time I was at Mr. Cook's office, there was nothing at the meeting which would distinguish it in my memory from the second meeting, so that I will have to answer that question as though the June 14th meeting were the only meeting I had present in my mind. * * * Her appearance was usual and ladylike, attractive and not in any respect different from that of her companion. * * * She was dressed as usual and her deportment was usual." When asked if there was anything in the acts or conversation or conduct of Mrs. Christian which indicated her soundness or unsoundness of mind, the witness said: "I had no thought about the matter; it never occurred to me."

Eliza's child, which was born in New York on January 1, 1909, was delivered on the platform of an elevated railroad and Eliza was hurried to the Manhattan maternity hospital where she was attended by Dr. Masson for about three weeks. Dr. Masson, who for some years has been a surgeon at the Mayo clinic at Rochester, Minnesota, testified that he was the resident physician at the Manhattan maternity hospital when Eliza was brought there. He remembers when she was brought to the hospital and that

she was placed in a private room and that he saw her at least once a day and sometimes oftener while she remained in the hospital. During these visits he talked to her but always on the subject of her condition. When asked if she spoke like an intelligent person, he said: "I always got what I considered satisfactory answers to questions asked her and looked upon her as a rather diffident foreigner who did not speak a great deal of English. * * * I am quite sure I remember that she" spoke with the accent of a foreigner. "She was a very obedient patient and gave no trouble to the hospital authorities, as I observed her." When asked if he observed anything irrational as to demeanor, he said: "No. Nothing was noticed by any of the hospital staff. * * * I considered her quite normal." When asked if she ever did anything in his presence that indicated that she was mentally deficient he said, "no." When asked if her demeanor impressed him as being the demeanor or acts of a mentally incompetent person, he said, "no." He also said he considered her normal mentally.

The witness was shown certain documents which he identified as the records and charts of the hospital kept by him or under his direction and supervision, and from these records and charts reaffirmed his opinion as to Eliza's mental condition. On cross-examination he testified that the greater part of his training and experience had been in surgery and gynecology, except for a period of about three years, when he was engaged in a private capacity in the general practice of his profession. He never made an examination of Eliza as to the degree of her mentality. He never used any tests recognized by alienists to determine the degree of her mentality. He was unfamiliar with these tests. He made no observations as to whether she could add two and two or whether she would be able to subtract or read or write or memorize

or could appreciate the value of money or of property. He made no observations as to her standards of morality.

In 1909 Eliza Christian went, again with her father and Annie and Lawrence Kentwell, to England, where she has ever since resided. This constitutes the latest period of her life. During this period she has lived (except for perhaps four years when she lived in London) at the home of the Kentwells in Oxford. There is little or no evidence concerning her while she was living in London. There is, however, a great deal of evidence concerning her during her residence with the Kentwells at Oxford. This evidence covers a term of more than twenty-five years and was given in the form of depositions, nearly all of which were taken at Oxford by a commissioner, the witnesses being examined and cross-examined orally by counsel for the respective parties. It is so voluminous that it would extend this opinion beyond reasonable or necessary length to review it in detail. We shall, however, set it out sufficiently to give an adequate understanding of its general tendencies and its probative effect.

It was during the period we are now considering that Eliza signed the deed to James L. Holt, which is the subject of the present suit, this deed, as we have already seen, being dated May 2, 1910. On May 21, 1912, she also signed a deed which purported to convey to John M. Dowsett certain lands at Makaha. On January 11, 1923, she signed a power of attorney to Henry Smith, of Honolulu, and on March 16 of the same year signed another power of attorney to Henry Smith. Two letters were received in evidence by the circuit judge and are a part of the record, the originals of which the Waialua company claims were written by Eliza during the period of her life now under consideration. During this period she gave birth to another illegitimate child, which is still living.

Catherine Hambridge testified that her occupation was

that of housekeeper; that she had followed that occupation for at least twenty-five years; that she was in Mrs. Kentwell's service at Oxford on July 8, 1911, and lived in the Kentwell house for about eight months and since that time had visited the Kentwells continually and that during her acquaintance with the Kentwell family she had come in frequent contact with Eliza and knew her well; that Eliza was not able to take care of herself in the ordinary way —had to be told things that should have been told a child; had to be told more often than not to have a bath and when to change her clothes and linen; that she wrote and read very badly, frequently went into fits of temper if anybody offended her and if she was much upset she would go upstairs and shut herself in a room and not come down to meals. This happened fairly frequently—not very often. The witness believed that Eliza was fond of the Kentwell children, but "very often got exceedingly angry and I have known her to give the little boy a knock." The cause of these fits of anger with the children was "because she wanted them to do something which they objected to." The witness never knew Eliza to carry on a rational conversation with anyone. "She could not reason out anything with you. * * * She would go out and you did not know when she was coming back. One day she went out, I believe it was fair time, and she came back drenched. She went out several times and when she came home she was very wet and went straight to her room. She would not see Mrs. Kentwell at all." She always had to be told to change her bed clothes. The witness was present and was housekeeper at the time Eliza's father died. She showed "no actual grief that I noticed. There were no tears shed when her father died. That I do know. We had a nurse and she did not help nurse him at all." She "never went near." She "did go out alone sometimes. She went to the pictures but she was always told what time to

come back." She would always come back "fairly right." All the time the witness had known Eliza her condition had been the same—"more like a child than anything else. * * * She rarely carried on a conversation. She did not seem to have the power to." When asked as to her susceptibility to influence or capability of resisting it, the witness said: "If she liked a person very much she might do anything. I never quarreled with her but the servants quarreled with her. I treated her as a child from the time I went there. I saw that she was not really all there and I tried to be tactful with her so that I never quarreled with her and she would fairly do the things I asked her. * * * You might get her to do things by coaxing her. * * * I use to say: 'Do so and so, there's a good girl,' whereas if I ordered her she might have refused." When asked if she noticed any other trait the witness said: "Of course I did notice. I think I was sitting at table one day she played the piano and there was no time or anything in it. She said: 'When I was at school I took several first prizes.' It meant that the woman was not equal to doing what a child of six ought to have done. That was very like a child's doing." When asked if she could recall anything else indicating Eliza's mental condition, the witness said: "The whole thing of course was childish. I treated her as such and spoke to her as such. If I racked my brain I might find a lot of odd things which showed how simple she was. She always wanted to be very much alone. If anyone came in she never wanted to come down; she always wanted to go upstairs to her room. * * * Sometimes she would cut paper and make some paper flowers but then she would sit upstairs doing nothing. She could not read much."

Lily Jamieson testified that she had worked with Mrs. Kentwell for four or five years, beginning sometime in 1909; that after this term of service expired she went

away and later returned and remained until a month or two before her testimony was taken; that Eliza was living with the Kentwells all the time the witness was there. When asked if she noticed any indication of temper on her part she said: "Yes, she got into a temper, she came into my room between five and six in the morning and thumped me on the head and quite dazed me. I had to call Mrs. Kentwell to my assistance." This "happened only recently." The cause of Eliza's striking her was that "the kitchen door was locked, and she seems to think it was through me it was locked. She thought I was the cause of it being locked and so she thought she would have her revenge on me." When asked about Eliza's cleanliness she said: "Well, she would never change her things nor never wash, not when she was told." When asked what she would do with her spare time the witness said: "She generally used to go into her own room. She would sit up there; she would read or cut things out of the newspapers." In explanation of what she meant by "reading" the witness said: "She would look at papers then, but she cannot read sentences properly. * * * I have heard her try. She has done that with me." She would cut out "pictures and advertisements, chiefly advertisements. * * * Just anyhow she would cut them. * * * Just keep them, collect them together, keep them." When asked about her conduct towards the tradesmen that came to the house the witness said: "She was very fond of going to the door and talking with them, and giving silly, trifling things to them" like "flowers, pencils or anything like that she would give." If a little money was given to her "she would often give it away * * * to people in the street or if not, she would spend it on silly things. Things that were of no value at all, childish." She could not handle money "because she could not give correct change and she could not count money. * * * That I know from

my own experience." When asked if she had ever seen Eliza try to write the witness said: "No, she cannot write at all. She cannot make her letters nor spell properly. You would have to tell her how to spell, she cannot spell. * * * I have seen that. She has always had to ask someone to spell words for her. * * * Once when I was with her" (on the street) "she turned round and swore at me simply because I wanted her to come home. She wanted to stay out and she turned round in the street and swore at me. * * * She has gone off and stayed out quite late at night, and Mrs. Kentwell or someone has had to go and search for her. * * * She has often come to our house and has acted very silly. Dances about very silly you know in the house. * * * I have always had to bring her home. She could never go home by herself." During all the time the witness knew Eliza "she has never improved, has never got any better. She has always got into these terrible tempers."

Mrs. Frederica Jamieson, the mother of Lily Jamieson, who saw Eliza at her (the witness's) home on four or five different occasions, testified to several instances of peculiar conduct on her part.

Ethel Margaret Richardson, a trained nurse, testified that she had known Eliza "one way and another" for about twenty-two years; that she was a frequent visitor and guest at the Kentwell home and Mrs. Kentwell and Eliza had been frequent guests at her home. When asked what she knew of Eliza's ability to read, she said: "Well, I should say not. Nothing over little tiny words, because I showed her myself a letter when I mislaid my spectacles and asked her if she could read it. It was perfectly legible, but all she made out was 'clock;' nothing else; she said she could not read the rest." Speaking of her ability to take care of herself the witness said: "I should think she would be like a stray sheep if she was let loose. * * *

One does not like to be too personal, but I should not say she was by any means a very cleanly person. Certainly she did not look much brushed up. * * * I am quite sure she could not" make plans and arrangements for herself. Speaking of her character of speech the witness said: "She talks extremely indistinctly, and it is very difficult for me to make out what she is saying until the sentence comes to an end. She talks as if she had a sort of impediment in her mouth. * * * She does not seem to have any interest in anything except in what you might call immediate creature comforts. She will talk about meal time being near at hand; she will talk about the pictures, but I don't think she could tell you what the pictures are about. *. * * From my observation she would just hang about, gaze out of the window probably and twist her apron between her thumbs. * * * She is certainly very moody. She has a way of going into a sulk for no apparent reason and she stares in an uncanny way, and she looks very loury, very loury, as if she was nursing a grievance." When asked if she had ever been any different from the condition described, the witness said, "no." On cross-examination the witness said she was a great friend of Mrs. Kentwell's.

Mrs. Eliza Joliffe, who was residing in London but who had formerly lived at Oxford, testified that she was a frequent visitor at the Kentwell home and "saw quite a fair amount" of Eliza; she used to come "to my children's parties. She never came to the grown-up parties." When asked whether during the time she had known Eliza she had ever known her to carry on a really sensible, rational conversation with anybody the witness said: "Good gracious, no! I should think it was quite impossible. She would just say 'Yes' and 'No,' or 'it is a nice day,' or 'How are you,' beyond that, unless you asked her questions she would not volunteer any statement at all."

When asked whether she had ever known Eliza to participate in any conversation, or what part she took in conversations she said: "Well, vulgarly speaking, a back seat, always, I should say. She would sit and look and perhaps smile. I really do not remember any occasion when she would volunteer any statement."

Mary Clapton, a servant in the Kentwell home, had known Eliza during the five years she had worked there. When asked about her ability to take care of herself in the house the witness said: "She cannot take care of herself and she wears clothes from one week-end to another unless you have the clothes in your hands and put them on her. Even to her bath, you have to tell her to have a bath once a week otherwise she would not do it. * * * She can read a little but she cannot understand what she is reading. * * * I have seen her try, but she cannot make out the words. * * * I have only seen her write her own name, that is all she can write." When asked what Eliza did with her spare time the witness said: "She generally gets hold of a newspaper and cuts out rubbish * * * cats and dogs and pictures like that. * * * She cuts them out all crooked. * * * She generally puts them in a drawer in the kitchen. * * * She has never used the telephone. * * * She has several times been up in her room and would not come down and has remained there all day long. I have been up and asked her to come down to her meals, and she has slammed the door in my face. * * * When it has been a bitter cold day she has been in her room with the window wide open. I have been up and asked her to shut it and she has slammed the door in my face, shivering with cold. * * * She cannot cook." The witness also recited instances of temper on Eliza's part. When asked about her treatment of her clothes the witness said: "I have seen her" tear them up—"good clothes they were. She has torn them up in front of me."

Arthur Lambert, a plasterer, testified that about 1913 Eliza often came to his house and stayed all day and while she was there she did nothing but sit and lie about; that her talk was "silly kind of talk. I cannot tell you exactly what she said, but childish talk." One time she stayed at the witness's house a fortnight but never slept in the house but would go away at night and return in the morning. "I told my wife to see Mrs. Kentwell and tell her we could not put up with her any longer. She went to see Mrs. Kentwell and Mr. Kentwell came and fetched her away." The witness said: "During the time she was staying at our house she was very dirty in her ways;" when she would come back in the morning she would be "as though she had been walking about all night by the appearance of her;" her clothes were "very dirty." When asked: "And at the end of the fortnight had she had a change of clothes?" the witness said: "Not to my knowledge." The witness's residence was in Oxford and about "a mile and a half" from the Kentwell home.

Mrs. Mollie Alatau Wilder testified that she had known Eliza since 1920, while she was living at Oxford with her son who was attending the university, and since then had seen her from time to time. When asked to state what she had observed in the conduct or appearance of Eliza indicative of her mental condition the witness said: "There is no question in my mind that Eliza Holt Christian had the mind of a child. I spoke of that to Mrs. Kentwell at the time." When asked if she had ever endeavored to converse or speak with her and what had been the result of such attempt, the witness said: "Yes. I have. * * * I would consider that her answers were very simple. I could not carry on any conversation with Eliza. I tried to." She had seen her at the Kentwell home in Oxford off and on for about three years. When asked if she had ever heard her carry on a rational conversation with any-

body the witness said: "I never have. I have never heard her answer more than a word or two, at any rate, if any questions were put to her. She did not seem to be able to converse. * * * I looked upon her simply as a child sitting there. * * * I simply felt that Eliza when I was there was a child in the place. She was just there and that is all. You did not pay any attention to her, she was just there." The witness never saw Eliza endeavor to read or write.

Dr. Thomas Saxty Good, a medical practitioner and medical superintendent of the Oxford and County Mental Hospital, testified that he was qualified in 1893 and had been thirty-three years at Littlemore, during twenty years of which time he had been superintendent. He also testified that he was Master of Arts at the University of Oxford, a member of the Royal College of Surgeons and licentiate of the Royal College of Physicians. He further testified: "I have done my work necessarily at the mental hospital. During the war I was consulting neurologist to the 3rd Southern General Hospital. Then for 4 years I had a neurological hospital, first in the army, in which I still hold the rank of Lieutenant-Colonel; then for 2 years under the ministry of pensions. I am on the staff of the Radcliffe infirmary as neurologist and I also lecture on my special subject to the faculty of medicine. * * * The title of my lecture is 'Neurological methods,' in addition to that I am expert and referee for the feeble-minded for the city of Oxford and also for Oxford county." He had on four different occasions examined Eliza Holt Christian as to her mental condition. The first time was in 1915, the second on May 31, 1925, the third on November 30 or December 1, 1926, and the last time on October 25, 1928, a few days before his testimony was given. When asked his opinion as to her mental condition he said: "One of what, under English law, is a feeble-minded

·person. \* \* \* I put her at about equivalent to a person of 4 or 5. It is difficult to be absolutely exact, but she has the mentality of a child of about 4 or 5." The witness then explained the system he used in reaching his conclusion. Speaking in detail of the result of his examinations the witness said: "She cannot compare simple objects. Might I give an instance? For instance, you ask, 'I want you to tell me the difference between an apple and a banana.' She told correctly an apple was round and a banana long. You give one mark for that. I said, 'Give another difference.' She said bananas grew on very high trees and apples grew on very low trees. The next question I asked her was, 'What is the difference between wood and glass?' She did not attempt to answer; she was completely confused. She could not give any difference between those, nor could she between paper and cloth. Therefore one said that her powers of comparison were very much below the normal. Then there is the definition which is used to see whether people know things in terms of use and in terms superior to use. You ask, 'What is a chair?' She said, 'to sit on,' but when you pressed her she could give no further definition of a chair or further comparisons with other objects.. On asking her, 'What is a horse?' she simply gave a description of a horse in a carriage, but she could not tell you what good or use the horse was in that carriage. \* \* \* I gave her quite a simple addition sum and she could not, as far as I could ascertain, do any addition at all. A question I did ask her was a simple subtraction in terms of money; she did not seem to know how many shillings there were in a £, and she could not even tell me if I took three away how many were left. I tested her for her power of reading; that test does test because there are certain words jumbled up which have to be put together to make a sentence, and she could not read some of the words at all. She could read some

of the small, little words, but a word of perhaps two syllables very often one had to spell it out and then she did not seem to know it. Then again, her vocabulary, which is a well known test in which you say, 'Now I am going to give you three minutes, I want you to say as many words as you can,' a word like dog, cat, piano. She produced about twenty words simply the names of nouns which is very much below what is considered even normal. It has been known for a normal child to produce something up to two hundred in that time." The witness also spoke precisely of other tests to which he had subjected Eliza, all of which in his opinion disclosed a puerile condition of mind.

Dr. Amyas Theodore Waterhouse, a practicing physician, who had also had a wide experience in the examination of mental defectives, testified that he had examined Eliza on two occasions, first in 1926 and again in October, 1928. Regarding her mental state he said: "I came to the conclusion she was a feeble-minded person and that her mental age was approximately six years." The witness then explained the method used by him in making examinations. When asked whether he considered the condition in which he found Eliza to be of recent occurrence or a continuing one he said: "I should say it has been a continuing condition.. * * * I should say it has most likely been life-long."

Dr. Edwin Morton, also a practicing physician, testified that he had practiced in England since 1885. When asked about his experience in the treatment of persons mentally defective he said: "I took a special course out in Edinburgh at the Morning Side Asylum. I repeatedly acted as locum tenens at the Warneford Mental Hospital in Oxford. I was medical superintendent at a special school for mentally deficient children at Wolverhampton. * * * For the past ten or twelve years I was co-opted as

a member on the statutory committee for the city of Oxford for the treatment of mental deficients and I am chairman of the Voluntary Association for Mental Welfare." During his experience several cases involving mental defectives had come under his observation. He first became acquainted with Eliza and Mrs. Kentwell about 1909. He met them as a medical attendant. He was medical attendant for the family for about sixteen or seventeen years. He treated Eliza professionally and in a general way observed her mental condition. He had seen her quite recently, at Mrs. Kentwell's house in Woodstock Road. When asked his opinion as to her mental condition he said: "Well, she is obviously of feeble intellect and I should put her about the level of a child of about five or six." When asked whether in his opinion this condition had continued since he had known her the witness said: "Well, she appeared to me much the same as she was when I first knew her. * * * I should say it is a continuing condition."

There were other witnesses who gave very much the same description of Eliza's mentality during this period as did those whose testimony we have mentioned. Still other witnesses, however, described her mentality quite differently.

For instance, Dr. Charles James Douglas, a practicing physician and a licentiate of the Royal College of Physicians in Ireland and also of the Royal College of Surgeons in Ireland and a member of the British Medical Society, testified that he had practiced his profession for forty-eight or forty-nine years and from time to time had advised upon cases of mental abnormality,—both feeble-mindedness and insanity; that on February 17, and again on February 19, 1923, he went to 159 Woodstock Road, Oxford (which was the Kentwell residence); that on the first visit Mrs. Kentwell was not in and he went

again the second time, when he saw Mrs. Kentwell and explained to her the object of his visit. He then saw Eliza Holt Christian, with whom he had a conversation. "At first I asked a few questions to gain her confidence, to make her at ease with me; reference to suffering from an attack of influenza. Then I asked questions in relation, and she did not show any resentment or disinclination to answer questions, and I asked her if she understood what the reason of my coming was. I wanted to find out if she thoroughly understood the position with regard to signing a document to enable Mrs. Kentwell to receive her money; she said 'yes.' She thoroughly understood that and had every confidence in Mrs. Kentwell, and even if she were advised to the contrary she would take Mrs. Kentwell's advice in preference to anybody else's, that she had absolute confidence in her affection and love for her and good will towards her. * * * That was the first part. I can't remember, it would be about eight or ten minutes. I asked her other questions which I can't remember now to satisfy myself as to her general outlook on life, that it was fairly normal. I got no answer that did not satisfy me. As to the particular questions I can't remember." When asked whether she took a part in the conversation the witness said: "Well, she was in, in that the conversation would be more or less a question and an answer, but she was not—I could not tell you really what she would enlarge upon, but she certainly showed no hesitation in giving me an answer to any question that I asked. * * * It" (his question) "was appreciated and understood and answered." She gave "an intelligent answer." Mrs. Kentwell invited the witness to stay for a cup of tea and he accepted. Speaking of the conversation during the tea the witness said: "We had general conversation, and during that time I observed as keenly as I could the attitude of Mrs. Christian and was confirmed in my previous im-

pression that her attitude was quite normal. * * * She took a certain part, not a prominent part in the conversation, and I don't remember what the conversation was about. I think they told me something about their life abroad and talked about local events as far as I can remember. She struck me as a neurotic, a bad neurotic, and was suffering from the effects of an attack of influenza at the time." Eliza "told me she was married, had lived with Mrs. Kentwell for the last seventeen years. * * * She was married at seventeen years of age, lived with her husband for one year, who was very cruel and she separated. He is still alive; she went to live in New Jersey with Mrs. Kentwell; came to England in 1909. When a child she suffered from lapse of memory but now her memory is quite good." When asked whether she told him all this the witness said: "That I gathered during our conversation, although here I mention that while gathering this information from Mrs. Holt Christian I was struck by her minute attention to details and by her evident affection for Mrs. Kentwell and her children. * * * This is the sum total of my recollection, I incorporated immediately thereafter." (By incorporating it, the witness evidently meant that he had incorporated the above conversation in a letter which he had written to Mr. Garnett a few days after he saw Eliza, which letter is attached to his deposition as an exhibit.)

Henry Holmes, Esq., who has been a member of the bar of this court since 1892, testified that he first met Eliza Christian in the year of 1912 in Oxford, England, where she was residing with Mr. and Mrs. Kentwell; that "I went there to announce to Mrs. Christian that Mr. J. M. Dowsett, the assignee of an option that she had given in 1907, I think, which was to May K. Brown, the wife of Arthur Brown,—that Mr. Dowsett was prepared to exercise that option, which had been transferred to him by

Captain Matson." The witness was shown a copy of the option and identified it. When asked if he knew the signature of Eliza R. P. Christian the witness said: "Well, I saw her sign her name to the conveyance by her to Mr. Dowsett, at the consulate in London, at the time that she carried out the provisions of that option by conveying the interest that she had in Makaha to Mr. Dowsett." When asked whom he saw when he called at the Kentwell home in Oxford, the witness said: "The door was opened to me by Mrs. Christian. I told her where I had come from and what my name was, and she invited me into the house. I went with her into a sittingroom and there I saw her father, Mr. John D. Holt, whom I had known in Honolulu. * * * I told them what the object of my visit was. * * * I said that I had come to ask Mrs. Christian to carry out her agreement or option to transfer her share of Makaha to Mr. Dowsett. John D. Holt said, 'Kentwell is acting for us and you have got to tell Mr. Kentwell what it is you want.' * * * I stayed about ten minutes or quarter of an hour with them, and we talked about Honolulu. I asked them how they liked living in Oxford and both of them answered. I remember John D. said 'I find it very cold,' but he thought the country was very beautiful, and she said that 'I think he doesn't like it because he misses his poi. * * * She" (Eliza) "said, 'Well, I think he doesn't like it very well because he misses his poi,' and the old man said, 'Yes, that's it; I would like to get back to Honolulu to have some more poi.' She said, when I asked her the same question, if she liked it, that she liked the cold; went out for one or two walks every day, usually with her father, and she liked what she called 'the life,' I mean the quiet, very decent life there is there in the university city of Oxford. * * * The conversation was fairly general and what was to be expected between a person arriving from Honolulu and these two Hawaiians." When asked if the

conversation was with both John D. Holt and Mrs. Christian the witness said: "Yes, they were both there. One would talk and then the other." Speaking of her appearance at that time Mr. Holmes said: "She seemed to be in very good health, judging by the color of her skin; of course it's a cold country and if you get out much you will have pink cheeks. She seemed to be in good health, I would say." The witness saw Eliza again at the Kentwell home within a week. Speaking of who were present at the second meeting the witness said: "Mr. and Mrs. Kentwell were there, and Mrs. Kentwell's children, and Mr. John D. Holt and Mrs. Christian. * * * My wife was with me. * * * We were invited to stay to tea, and tea was served in the garden, I might put it, at the back. Mrs. Kentwell said to Eliza, 'Will you sit with us?'—'us' meaning with Mr. and Mrs. Kentwell, my wife and myself. She says, 'No, I'll sit with the children.' They had a table a short ways from the old folks' table, and she said, 'I'll sit with the children.' * * * There was a little general conversation. My wife would ask her" (Eliza) "a question, or I would, and usually get an answer." When asked if anything was said at that time with relation to the proposed sale to Mr. Dowsett the witness said: "Well, I had mentioned to Mr. Kentwell, of course, the purpose of my visit. He seemed to understand the case very well, because of the experience that he had had in the case of Waialua when Mr. Withington went across. It was not a novelty to him, or it was not unexpected that Mr. Dowsett or someone representing him might appear on the scene in connection with the option that Mrs. Christian had given. * * * Mr. Kentwell said, 'If I could escape the obligation to carry out that option * * * I wouldn't carry it out.'" When asked when he next saw Mrs. Christian the witness said: "Oh, I saw them more than once on that visit to Oxford. They came to the hotel to dinner the night after the tea

we had had,—Mr. and Mrs. Kentwell and Mrs. Christian; John D. didn't want to go. We had them to one of the hotels in Oxford to dinner; they stopped quite late, about ten o'clock." There were present "Mr. and Mrs. Kentwell and Mrs. Christian and my wife and myself. * * * I suppose the dinner would take place about seven o'clock, half-past six or seven, and they certainly were there until about ten. * * * We talked about all sorts of things,—with this exception, Mr. Kentwell said, 'You better acquire John D. Holt's, what you call, contingent interest, or buy his interest.' " When asked if there was any conversation with Eliza that evening the witness said: "She was a girl that would speak if she was spoken to. She is not a forward girl; shy, retiring, but never hesitated to answer any question which was put to her, but never would start a conversation. * * * My wife talked to her." When asked when he next saw her the witness said: "My recollection is that—we were living at the hotel; my recollection is that we met them at lunch next day, at the hotel." There was a "general conversation there." When asked who joined in the conversation the witness said: "Well, Mrs. Kentwell talks very easily and rather fond of it, more so than her husband, but Mr. Kentwell talks, too, freely. Eliza would talk when she was spoken to but I don't think otherwise." The witness said: "I saw them next at the American consulate, in London." There were present "Mr. and Mrs. Kentwell, Mr. John D. Holt, and Mrs. Christian and I were there." The name of the consul was "either Westacott or Westmacott, I am not sure which." When asked to state what took place at the consulate while Eliza was there the witness said: "I arrived at the consulate before they did. When they came in the consul, or vice-consul, said, 'Oh, you Honolulu people are here again,'—evidently referring to the fact that he had met them while the Waialua transfer was made. * * *

He asked what the business was, and Mr. Kentwell said that they wanted him to take the acknowledgments to three deeds, I think he said just three deeds. * * * The first deed that was * * * produced was the conveyance by Eliza Christian to Mr. Dowsett of her share or interest in Makaha, according to the terms of the option." The witness was shown a document dated May 21, 1912, bearing the signature of Eliza R. P. H. Christian and identified it as the deed of which he was speaking. "The consul took the paper in his hand and looked over it and he said to her" (Eliza), " 'You understand that this is a transfer by you of some property in Honolulu?' and she said 'Yes;' then he asked her if she acknowledged that as her free act and deed,—the usual form. She said she did. Oh, I ought to mention that she signed the document there before him and he witnessed her signature, then took the acknowledgment afterward. * * * I was present all the time." When asked if there was any conversation or anything like that on the occasion when the deed was signed the witness said: "No, there was very little said at the consulate." When asked whether any money was paid at that time the witness said: "I had a certificate of deposit for what was the equivalent in England of $7,500, and I tendered that to Mrs. Christian, and her father said, 'Oh, give it to Kentwell,' and I asked her if that was all right, and she said 'Yes,' and I handed it to Mr. Kentwell." When asked if he saw her again after the execution of the deed the witness said: "Yes, we went to a moving picture show. In 1912 moving picture shows in England were not common, but this was more than usual because it was colored pictures of the Durbar in India. * * * Mr. and Mrs. Kentwell, John D., Eliza, my wife, and myself" went together. When asked if he remembered having any talk with Eliza the witness said: "No, I don't remember anything. Eliza—I was trying to explain to her something

about the movies, that is, what the Durbar was; apparently the meaning of the word was not commonly understood." This was the last time the witness ever saw Eliza. When asked if on any of the occasions mentioned by him there was anything to indicate anything unusual about her the witness said: "No, I saw nothing and heard nothing that would possibly raise that question in the mind of anybody who had a mind of his own."

Mekia Kealakai, bandmaster of the Hawaiian Band, and his wife, Millie Kealakai, visited the Kentwells in Oxford in 1919, remaining in their home for about two weeks. While they were there he saw Eliza daily and the way he looked at it "she is the servant of the family," doing washing, cooking, cleaning and everything; being helped by Annie Kentwell and her children. He had been frequently in the kitchen while Eliza cooked. When the meals were served all the family, including Eliza, ate together. From his observance of her he found her to be normal.

The testimony of Mrs. Kealakai was in substance the same as that of her husband.

Copies of four letters were received in evidence, the originals of which the Waialua company claims were composed and written by Eliza. Two of these letters were dated December 7, 1908, the third was dated January 29, 1910, and the fourth March 11, 1910. They were apparently addressed to James L. Holt and received by him in Honolulu sometime in April, 1910. The originals of these letters were taken by James L. Holt to the office of Castle & Withington and were handed to Mr. W. A. Greenwell, who was a member of the firm of Castle & Withington. Greenwell had copies made, compared the copies with the originals and handed the originals back to James L. Holt. These originals were lost and therefore were not produced. If the contention of the Waialua company regarding the authorship of these letters can from the evidence be sus-

tained they furnish very strong proof that Eliza was mentally capable of binding herself by the deed which in the instant case is sought to be set aside. We will consider this question later.

It is argued by the Waialua company that the probative force of the evidence which tends to show that Eliza Christian's mentality at the time the deed in question was signed by her was normal is so much more conclusive than the evidence tending to show the contrary that we should decide the question of the validity of the deed in the affirmative.

In this connection particular stress is laid upon what is termed "documentary evidence." This evidence includes the following instruments that were signed by Eliza long before she signed the deed in question: Lease to the Waialua company of March 17, 1905; assignment of rents to Annie Kentwell dated August 31, 1906; lease of August 31, 1906, to Annie Kentwell of Eliza's contingent interest in lands at Makaha; confirmation on June 13, 1907, of a lease by John D. Holt, Jr., to Annie Kentwell; deed dated October 26, 1907, to L. L. McCandless of property at Makaha; option of June 14, 1907, to May K. Brown; on the same day joining in a conveyance by Annie Kentwell and Lawrence Kentwell to May K. Brown of their interest in lands at Makaha. It also includes the following instruments signed by Eliza subsequent to the deed now in question: Deed of May 21, 1912, to J. M. Dowsett; power of attorney to Henry Smith dated January 11, 1923; a similar instrument dated March 16, 1923. None of these instruments, of course, bears any internal evidence of Eliza's mentality. She did not prepare them nor was she, so far as the evidence shows, a participant in the negotiations to which they related. Their value as evidence of her mentality, therefore, depends on the testimony of those who were present when she signed them. Regarding the in-

struments which she signed in 1905 and 1906, so far as we are informed from the evidence, the only person present when she affixed her signature was the notary who took her acknowledgments and he is no longer living. As to those that were executed in 1907 there is the testimony of the officers who took the acknowledgments, and as to the one that was executed in 1912 there is the testimony of Henry Holmes. The American consul who took her acknowledgment to this last deed is no longer living. Mack and Bernard, one a notary in New Jersey and the other a notary in New York, while performing a purely ministerial duty, each saw Eliza briefly on two occasions many years before he gave his testimony. Henry Holmes saw her on four occasions while arranging in behalf of his client for her signature to the deed. The testimony of these witnesses is in agreement that she gave no indication in their presence of any mental deficiency. It would not be fair to say, however, that this testimony, based as it was on casual observation, although entirely honest in motive, outweighs that of many contradicting witnesses whose opportunities for observing Eliza were much more frequent and whose acquaintance with her was much more intimate.

Regarding the powers of attorney executed by Eliza to Henry Smith, which are included in the "documentary evidence" which the Waialua company claims is cogent proof of her mental competency, it appears from the certificate of J. Rose, a notary, that they were executed in the presence of and acknowledged before him at County Hall, Oxford. It appears, also, that the one dated March 16, 1923 (the last one), in addition to being acknowledged before J. Rose, was also witnessed by P. Bates and H. W. Hansford. None of these persons, however, were called as witnesses and we have no means of knowing what their impression of her mental condition was at that time. Like

the instruments signed by her, to which we have already referred, these powers of attorney in and of themselves provide no evidence of the degree of her intelligence.

We have already mentioned four letters which the Waialua company claims were written by Eliza to James L. Holt. If she was in fact the author of these letters they would afford very strong evidence of her mental competency. While by no means models of English composition or even of grammatical construction, they indicate a reasonably sound mind—certainly a mind of sufficient maturity to execute a valid deed. There is no evidence, however, from which even an inference can be drawn that these letters were the products of Eliza's brain or her hand. The evidence discloses that they were taken to the office of Castle & Withington by James L. Holt. They were then copied by a stenographer, under the direction of W. A. Greenwell, and the copies, after comparison with the originals, were placed on file where they remained until they were produced at the trial. The originals were returned to Holt and were apparently lost or destroyed. Whether the originals were autographed or typewritten does not appear. Whether the signature was autographed or typewritten does not appear. Whether the letters were composed by Eliza or someone else does not appear. It is contended by the Waialua company that even so, the letters themselves, by their very construction, indicate that Eliza was their author. If her mind was in the rudimentary state indicated by many of the witnesses this contention is defeated rather than sustained by the letters. Many of the words used, the architecture of many of the sentences and some of the subjects referred to are certainly beyond the ability or the apprehension of one whose mind was that of a child five or six years of age. For instance, the letter of December 7, 1909, is as follows:

"With regard to the proposition made to you in my

behalf by Mr. Lawrence K. Kentwell in his letter of October 12, 1909, as to allowing me Fifty Dollars ($50.00) per month, until such time as you are able to dispose or buy my contingent interest in the ahupuaas of Halemano and Wahiawa situate in the district of Waialua, Oahu, T. H., for the sum of Forty-five Thousand Dollars ($45,000.00) Ten Thousand Dollars of which to be paid to me in cash upon the execution of a warranty deed duly signed and delivered and the balance of $35,000.00 bearing no interest upon the death of my father John Dominis Holt.

"It is to be understood of course that the monthly. allowance which you will advance to me from time to time shall be deducted from the sum of $10,000.00 on the final consummation of the deal.

"Trusting that you will do all you can in my behalf in getting this matter through satisfactory and kindly remember me to all the family at home, I remain with aloha,

"Sincerely yours,"

This letter has no characteristic that must of necessity be attributed to Eliza but is rather indicative of a person of more business experience and education than, according to the evidence, she possessed. The other letters, while not so sophisticated, cannot be said to bear upon their face the impress of her mentality or personality as distinguished from that of her father for instance, who, so far as we are informed to the contrary, is just as likely to have been their author.

In appraising the other evidence in the case we must do so with due regard to the comparative frequency with which the witnesses observed Eliza, the nature of their contacts with her and their descriptions of her conduct and demeanor on different occasions and during different periods. For example, the testimony of Mrs. Cushingham, who knew her at Makaha during the first period of her

life and who observed her with the view of ascertaining
the quality of her mind, strengthened as it is by the testi-
mony of Mrs. Zablan and others, that she was mentally
deficient, is much more reliable and conclusive than the
testimony of the witnesses who while working on the Holt
premises saw her playing on the beach and at other places
and who considered her normal.

Coming to the period which Eliza spent at the Catholic
school in Honolulu, we find the testimony of the Sisters,
whose specific duty it was to teach her and to ascertain
whether she was capable of making progress, a surer foun-
dation for a conclusion as to her mentality than the testi-
mony of the many witnesses who as children carelessly
saw her playing about the school and noticed nothing
abnormal in her conduct. The testimony relating to her
mental condition during the short period she was at St.
Andrew's Priory is almost entirely without conflict—that
she was simple-minded. The testimony bearing on her
mental condition during the later periods of her life is
much more voluminous, and, while not entirely in accord,
nevertheless, when considered in connection with the fre-
quency with which the various witnesses observed her be-
havior in the simplest things pertaining to her life and
the opportunities they had of observing her general de-
meanor, tends so strongly to establish the fact that she
was mentally impotent as to exclude any other reasonable
hypothesis. No child of normal mind, who had spent sev-
eral years in schools of recognized standing, under the
tutelage of competent teachers, would be unable to pro-
gress beyond the simplest and most rudimentary studies.
No such girl, after she had reached the age of adolescence,
would be unable to recite the alphabet and count beyond
a few numbers or read only the simplest words or carry
on a rational or sensible conversation or take ordinary
care of her person or her clothes or intelligently perform

any kind of household duties. No such girl, while in a state of advanced and obvious pregnancy, would sit in the daytime on a public street and play marbles with a number of boys, or without shame would answer the calls of nature in public places, in the presence of others, or do the many other irrational things Eliza is shown to have done. No such girl, testifying in a case in which a man was charged with having raped her, would be so utterly unable to give an intelligent account of what had occurred as was Eliza in the Hall case. We cannot accept Lorrin Andrews' testimony that she was merely acting. That assumption is entirely inconsistent with her mental ability. The reasons for her many manifestations of imbecility during the major part of her life are furnished by the testimony of Dr. Good, Dr. Waterhouse and Dr. Morton, who, long after she was a mature woman, tested her mentality by scientific methods and were of the opinion that she possessed the mind of a child five or six years old and that her condition was a continuing one. The testimony of these eminent experts is not weakened by that of Dr. Masson who saw her at the maternity hospital in New York but who is not a specialist in mental deficiency and who made no examination of her with reference to her mental condition. Nor is it weakened by the testimony of Dr. Douglas who talked with her at the Kentwell home in Oxford. Dr. Douglas is admittedly not an expert on the subject of mentality and his opinion cannot be given the same weight as that of Dr. Good, Dr. Waterhouse or Dr. Morton.

The overwhelming weight of the evidence requires us to find, and we do find, that on May 2, 1910, Eliza Christian was and at all times has been mentally incompetent to execute a deed or to understand its purpose or effect or to engage in any business transaction of consequence. She was feeble-minded. Born in 1885, in May, 1910, she

had the mentality of a child of not more than five or six. She could read only a very few words, and those very simple ones of two or three letters; could write her own name and could write simple words if they were spelled out to her by another 'person; she could not compose a letter or other writings; she was incapable of being taught any but the simplest things; she could not form any but the simplest sentences; she could not carry on an ordinary, sensible or rational conversation; if asked simple questions, she could answer them "yes" or "no," and sometimes in a very few more words; she was incapable of reasoning and was easily influenced by suggestion; she was utterly incapable of grasping the significance of a transaction involving the purchase or the sale of land or of valuing property or of determining the wisdom or lack of wisdom of making a sale. In short, we find that at the date of the deed she was a congenital imbecile.

The next question to be considered is the effect of the grantor's mental incompetency on the deed of May 2, 1910. More specifically the question is, does her mental incompetency render the deed absolutely void, requiring its unconditional cancellation without regard to the equities of the case, or does it render it voidable merely, leaving the rights of the parties, including the cancellation of the deed, to be determined according to equitable principles? This question has been ably and elaborately argued by opposing counsel.

It is contended by the Waialua company that the deed is voidable, that is to say, it is a valid deed until set aside by judicial order, and that a careful balancing of the equities, as that term is defined by law, and as such equities are disclosed by the evidence, must bring us to the conclusion that the deed should not be canceled and that the decree appealed from should be reversed.

On the other hand, it is contended on behalf of the peti-

tioner that the deed is absolutely void and should be canceled regardless of the effect of such action upon the Waialua company and regardless of the burdens that may be cast upon it by the cancellation. As an alternative contention it is claimed on behalf of the petitioner that even if it should be decided that the deed is voidable and that it is therefore necessary to consider the equities of the case, such consideration must bring us to the conclusion that the deed should be canceled and the decree appealed from affirmed.

If Eliza R. P. Christian prior to signing the deed had, in a proper proceeding, been judicially ascertained to be mentally incompetent, we think there can be no doubt that the deed would be entirely void. Such adjudication would be notice to the world of her mental state and whoever dealt with her would do so at his peril. We think, also, that if the Waialua company, or its agents duly authorized to obtain her signature to the deed in question, had actual knowledge of her incompetency or had knowledge of facts which would put a reasonable person upon inquiry, which inquiry if honestly pursued would lead to such knowledge, the deed would, as between the parties, be entirely void.

There is no evidence, and indeed it is not even suggested, that there had been any prior adjudication of mental incompetency, so that situation is not really before us. It appears from the evidence that David L. Withington, long deceased, in pursuance of the direction of the Waialua company, went to England for the purpose of completing the purchase of Eliza's interest in the lands and obtaining a deed from her. There is no dispute that Withington was the Waialua company's agent for this purpose and that he was the only representative of the company present at the time the transaction was closed. There is no evidence that prior to his arrival at Oxford Withing-

ton had ever seen Eliza or had been informed that she was mentally incompetent. Annie Kentwell's deposition contains the only testimony as to what occurred at the time the sale of Eliza's interest in the land was being discussed at Oxford. Her testimony on this subject is as follows: "I said to Mr. Withington, 'She is non compos mentis,' Mr. Withington said, 'I know it is all right we are taking the risk,' then my husband spoke up and said to me, 'it is all right dear, leave it to me.' * * * I said, 'If that is the case leave it to you then.'" This witness is greatly discredited by her thoroughly proven desire and that of her husband, Lawrence Kentwell, to facilitate the sale of Eliza's interest. Under these circumstances it is highly improbable that she would have done or said anything that might have jeopardized the fulfillment of those wishes.

Leaving out Annie Kentwell's testimony as being unreliable, and deciding independently of it whether Eliza's mental condition was so apparent that it was discoverable by ordinary observation and was therefore in a legal sense known to Withington, we think it only fair to again refer to the testimony of the notaries in New Jersey and New York and the testimony of Dr. Douglas and that of Mekia Kealakai and his wife and also to that of Henry Holmes. None of these witnesses saw anything about her indicating an impaired mind. It is true that in deciding the question whether Eliza was mentally incompetent we have not followed the testimony of these witnesses, nevertheless we think it of sufficient weight concerning the impression she made upon superficial observers to justify the conclusion that Withington, who is not shown to have had any closer contact with her than did these witnesses, likewise saw nothing in her to cause him to suspect that she was not of normal mind. Of course, if Withington, knowing of her incompetency, had taken the deed from her notwith-

standing, it would have been a highly dishonorable and unprofessional act and thoroughly inconsistent with the character and reputation which he is shown by the evidence to have possessed. During the testimony of Arthur Withington relative to the professional and personal character of his brother, David Withington, counsel for petitioner made the following statement in open court: "I want to add my personal commendation of the remarks of witness, and say that we do not come before this court with any intent or desire in any way to besmirch the name of Mr. David L. Withington. We agree that he was a man of estimable character. The only charge in this case is the mistake that was made in this instance, as is apt to be made by the best of us."

Assuming, however, that the Waialua company had no knowledge of Eliza Christian's incompetency, it still remains to be decided whether the deed in question is nevertheless void or merely voidable. Upon this question courts of last resort are not in entire harmony.

Counsel for the petitioner claims with great earnestness that the rule laid down in *Dexter* v. *Hall*, 82 U. S. (15 Wall.) 9, 20, 21, is controlling in the instant case. In the *Dexter* case one Hall, while an inmate in a lunatic asylum in Philadelphia, signed and acknowledged a power of attorney to his brother-in-law, Harris, empowering him to sell certain lands which he (Hall) owned in California. In pursuance of this power Harris conveyed the lands to certain persons who in turn conveyed them to Dexter. Subsequently Hall died in the asylum, leaving a widow and four children who brought an action of ejectment against Dexter for the recovery of the lands. Their contention was that the power of attorney to Harris was void because of Hall's mental condition at the time he executed it and therefore the title to the lands never passed out of him. The Supreme Court of the United States, which

ultimately decided the case, said: "Looking at the subject in the light of reason, it is difficult to perceive how one incapable of understanding, and of acting in the ordinary affairs of life, can make an instrument the efficacy of which consists in the fact that it expresses his intention, or, more properly, his mental conclusions. The fundamental idea of a contract is that it requires the assent of two minds. But a lunatic, or a person *non compos mentis,* has nothing which the law recognizes as a mind, and it would seem, therefore, upon principle, that he cannot make a contract which may have any efficacy as such. He is not amenable to the criminal laws, because he is incapable of discriminating between that which is right and that which is wrong. The government does not hold him responsible for acts injurious to itself. Why, then, should one who has obtained from him that which purports to be a contract be permitted to hold him bound by its provisions, even until he may choose to avoid it? If this may be, efficacy is given to a form to which there has been no mental assent. A contract is made without any agreement of minds. And as it plainly requires the possession and exercise of reason quite as much to avoid a contract as to make it, the contract of a person without mind has the same effect as it would have had he been in full possession of ordinary understanding. While he continues insane he cannot avoid it; and if, therefore, it is operative until avoided, the law affords a lunatic no protection against himself. Yet a lunatic, equally with an infant, is confessedly under the protection of courts of law as well as courts of equity. The contracts of the latter, it is true, are generally held to be only voidable (his power of attorney being an exception). Unlike a lunatic, he is not destitute of reason. He has mind, but it is immature, insufficient to justify his assuming a binding obligation. And he may deny or avoid his contract at any time, either dur-

ing his minority or after he comes of age. This is for him a sufficient protection. But as a lunatic cannot avoid a contract, for want of mental capacity, he has no protection if his contract is only voidable."

While the language of the court is broad enough to include all contracts of insane persons, whether their insanity had been judicially predetermined or not, or whether it was known or unknown to those dealing with them, the case which the court actually had before it was the act of a man who was, at the time the power of attorney was executed, confined, under commitment, in a lunatic asylum. This in itself was sufficient to inform anyone coming in contact with him that he was in no condition to transact business and that it would be hazardous to deal with him. It cannot be said, therefore, that the facts before the court required it to decide or that it had in mind and therefore intended to decide that the deed of a mentally incompetent person, whose condition had not been judicially ascertained and was not otherwise brought to the attention of those for whose benefit the deed was made, was not voidable merely but utterly void.

In *Luhrs* v. *Hancock*, 181 U. S. 567, 574, the court said: "The deed of an insane person is not absolutely void; it is only voidable; that is, it may be confirmed or set aside." The facts which gave rise to this expression were as follows: On February 27, 1886, the legal title to a certain tract of land in Arizona was in one William A. Hancock. On that date Hancock deeded the property, which was a homestead, to his wife, Lilly B. Hancock. On March 5, 1892, Herrick & Luhrs obtained a judgment against William Hancock upon which execution issued and the property, which Hancock had conveyed to his wife, was sold to George H. N. Luhrs, who received a sheriff's deed. On March 21, 1892, Mrs. Hancock and her husband, who had borrowed money from one Robert Allstatter, executed to

Allstatter a mortgage on the premises. This mortgage was foreclosed and Thomas W. Pemberton became the purchaser at the foreclosure sale, and on February 14, 1895, received a sheriff's deed and took possession of the premises from the Hancocks. Luhrs, who held the deed from the sheriff under the execution sale but who had never been in possession of the property, brought an action of ejectment against the Hancocks, to which action Pemberton was afterwards made a party. Luhrs failed in the suit and Pemberton prevailed. On appeal to the supreme court of Arizona the judgment of the lower court was affirmed and on appeal from that court to the Supreme Court of the United States the judgment was also affirmed. The foundation of Pemberton's title was the mortgage which the Hancocks had executed to Allstatter and in order to defeat his rights under this mortgage it was sought to introduce evidence of the insanity of Mrs. Hancock at the time of its execution. In certifying to the Supreme Court of the United States the exceptions that were taken to the rulings of the trial court, the supreme court of Arizona included the following: "(3) The rejection of evidence of the insanity of Mrs. Hancock at the time she executed the mortgage to Robert Allstatter, the foundation of Pemberton's title. (4) The admission in evidence of the note and mortgage over the objection of plaintiff claiming Mrs. Hancock insane and incompetent to make them." These two exceptions are the basis of the language which we have quoted from the opinion of the Supreme Court of the United States. Whether Mrs. Hancock had been adjudicated insane and placed under guardianship or whether the mortgagee knew of her insanity does not appear. We think it may be fairly assumed, from the ruling of the court, that neither of these conditions existed. If either had existed it seems obvious that the *Dexter* case would have been adhered to, or, if it was

thought that the doctrine there announced was unsound, it would have been overruled. The only reasonable conclusion is that in the *Luhrs* case the court intended to lay down the rule so often announced by other courts, that the contract of an insane person whose infirmity had not been adjudicated and was unknown to those dealing with him is not entirely void but voidable.

*Kendall* v. *Ewert*, 259 U. S. 139, 146, is also urged upon our attention as laying down the rule that the deed of a mentally incompetent grantor is entirely void. Confining ourselves to the facts of that case which are pertinent to this question, it appears that Redeagle, a Quapaw Indian, executed a quitclaim deed to one Ewert to certain lands. At the time he did this Redeagle was a common and habitual drunkard. Speaking of the effect of such extreme and continuous use of intoxicating liquors upon the mind the court said: "That habitual drunkards are not competent to properly transact business is so widely recognized in the law that in many States statutes provide for placing them under a guardian or committee, with authority to put restraint upon them and to preserve their property, not less for themselves than for those dependent upon them. A typical statute makes 'all laws relating to guardians for lunatics, idiots and imbeciles, and their wards * * * applicable to the guardians' for drunkards. (Ohio General Code, § 11011.) The extent to which one must have fallen below the standard of ordinary business capacity before he will be generally recognized in a community as a common drunkard is so notorious that we do not hesitate to say that evidence of competency entirely clear should be required to sustain a transaction in which such a person has plainly, as in this case, been overreached by a person dealing with him who is competent and aggressive. Men so reduced will sacrifice their property, as they have sacrificed themselves, to the craving for strong drink;

and Ewert's letters show that he knew perfectly well that the Indian with whom he was dealing had reached that unfortunate stage of decay." Upon these facts the court held that the deed was void. Most assuredly so, for the obvious reason that Ewert, the grantee, knew of the grantor's mental deficiency. We do not understand that this rule is even questioned. We know of no United States Supreme Court decision directly holding that the deed of a mentally incompetent grantor who is not under judicial guardianship and whose impaired mentality is unknown to those dealing with him is absolutely void. *Luhrs* v. *Hancock*, *supra*, seems to indicate that such a deed is voidable merely.

In *Clark Car Co.* v. *Clark*, 11 F. (2d) 814, 819, also called to our attention in behalf of the petitioner, the court said: "Under the weight of federal authorities, a contract executed by the attorney in fact for an insane person is absolutely void regardless of the other party's good faith, or whether or not he had notice of the insanity," citing *Dexter* v. *Hall, supra*. Again, however, the court by this language lays down a rule which is broader in its scope than the facts before it. It appears that one Clark had executed a power of attorney to his agent Hummel, authorizing Hummel to transact certain business for him and in his stead. Hummel, purporting to act under this power of attorney, had certain dealings with Lanahan in regard to Clark's property. Subsequently, after Clark's restoration to sanity, he brought a suit to set aside these transactions and it was in this connection that the language above quoted was used. The court also said: "In this application of law by the federal courts, the question of notice on the part of Lanahan and Hummel as to Clark's condition at the time of the execution of this deed is not important, for the minute Clark became mentally incompetent, his power of attorney was at least suspended dur-

ing the period of the incompetency, and any contracts executed during that period would be absolutely void. However, both Hummel and the defendant Lanahan had notice of Clark's serious condition." In view of this last statement it would seem that the broad doctrine laid down by the court was *dictum*.

*Edwards* v. *Davenport,* 20 Fed. 756, is often referred to in support of the view that the contracts of mental incompetents are under all circumstances entirely void. In that case Davenport, who was an imbecile, had executed a mortgage to Jonathan Edwards as trustee for the Equitable Trust Company of New London, Connecticut. The mortgagee had no knowledge of Davenport's mental condition. In a suit to foreclose the mortgage the circuit court held that the mortgagee acquired no rights under it as against a certain interest which Davenport owned in the property because of his imbecility. In reaching this conclusion the court felt obliged to follow *Dexter* v. *Hall, supra.* The inapplicability of *Dexter* v. *Hall* to a case in which the grantee was ignorant of the incompetency of the grantor has already been discussed.

What seems to us to be the better rule is thus stated in 32 C. J. 742 (§ 528) : "The requisites or essentials of conveyances generally apply to conveyances by insane persons. A conveyance will be invalidated by mental incapacity on the part of the grantor. There is some conflict of authority regarding the effect of an insane person's conveyance. While some confusion has arisen by reason of the use of the term 'void' and 'voidable,' and there are cases which have held that the conveyance of an insane person, who has not been so judicially adjudicated, is not merely voidable but absolutely void, and that the doctrine of innocent grantee has no application to such a conveyance, the great weight of authority is in favor of the rule that such conveyance is voidable and not absolutely void."

Devlin, in his carefully prepared work on deeds, says (§ 73) : "The deed of a person *non compos mentis* who is not under guardianship transfers a seisin and is merely voidable." In 9 A. & E. Enc. L. (2 ed.), the general rule is given as follows (p. 119) : "A person whose mind is so unsound as not to have capacity to contract is for the same reason incapable of making a binding deed of conveyance. But the deed of one who has not been judicially declared insane is not wholly void; it conveys the seizin, and must therefore be avoided at the grantor's instance after restoration to reason, or at the instance of his heirs or legal representatives after his death, or his privies in estate, or legal guardian, at any time until by lapse of time or legal affirmance the right to avoid is lost." Regarding what the author considers the minority rule, it is said (p. 120) : "On the contrary, it has been held that all conveyances of insane persons, except feoffments and conveyances by matter of record, are absolutely void and of no effect." The universal rule is said to be (p. 121) : "And if such person is under guardianship, or has been judicially declared insane, it is universally held that his deed is absolutely void."

As we have already observed, the deed of a person whose mental incompetency is known to those dealing with him is in the same category as the deed of a person whose mental incompetency has been judicially determined. In *Brewster* v. *Weston*, 235 Mass. 14, 16, the court said: "While some confusion has arisen by reason of the use of the terms 'void' and 'voidable,' it is settled in this Commonwealth that the deed of an insane person is not void, but voidable, and may, after the grantor is restored to his right mind, be adopted and ratified." After a careful examination of many cases we are convinced that this is the prevailing doctrine in this country and that it is a sound doctrine.

It is contended on behalf of the petitioner that in the instant case there is no real distinction, so far as the rights of the parties are concerned, between a deed that is absolutely void and one that is voidable; that in either event the deed in question must be canceled regardless of whether the grantor was fairly dealt with or not. On the other hand, it is contended by the Waialua company that the deed, being voidable, should not be canceled if it would be inequitable to do so. Again we encounter confusion in the law.

The rule contended for on behalf of the petitioner is thus stated in 3 Thompson on Real Property, 1007-1009 (§ 2848): "It is immaterial that in taking the deed the purchaser acted in good faith, and without knowledge of the grantor's insanity, and that this had not been judicially declared. One who deals with an insane person, as one who deals with an infant, does so at his peril. The fairness of the purchaser's conduct can not supply the grantor's want of capacity. Insanity is not always apparent nor is the minority of an infant always apparent; and there may be a loss in dealing in good faith with either; but the rules of law can not be changed in order to avoid all possible loss in either case. * * * The deed of an insane person not under guardianship may be avoided not only as against the grantee, but as against subsequent bona fide purchasers from the latter. Where an insane person is entitled to avoid a conveyance as between himself and his immediate grantee, he is also entitled to avoid it as between himself and any grantee or mortgagee holding under his grantee. 'When a man is defrauded, he may, as against his grantee, avoid his deed, but not against those deriving in good faith, and for an adequate consideration, a title from such grantee. He has the ability to convey an indefeasible title, and he does convey such title to all bona fide purchasers from his grantee. The insane

man has not the power to convey such indefeasible title. This incapacity inheres in all titles derived from him. The grantee whose title is thus derived must rely on the covenants of his deed. He risks the capacity to convey of all through whom his title has passed. The right of infants and of insane alike to avoid their contracts is an absolute and paramount right, superior to all equities of other persons, and may be exercised against bona fide purchasers from the grantee.'" 2 Black on Rescission and Cancellation 718-720 (§ 254) announces the same rule.

In *Hovey* v. *Hobson,* 53 Me. 451, 453, the court said: "The deed of an insane man not under guardianship is not void but voidable, and may be confirmed by him if afterwards sane, or by his heirs. If under guardianship, the deed is absolutely void * * *. The right of avoiding a contract exists, notwithstanding the person with whom the insane man contracted was not apprised of and had no reason to suspect the existence of such insanity, and did not overreach him by any fraud or deception." In *Brewster* v. *Weston, supra,* the court, in addition to what we have already quoted, said: "As a contract made by an insane person is voidable, it is not affected by the circumstance that the other party acted fairly and without knowledge of the want of mental capacity or of circumstances which ought to have put him on inquiry, because he who deals with one who is insane or with an infant does so at his peril." In *Hermanson* v. *Seppala,* 255 Mass. 607, 609, decided in 1926, the court said: "If the plaintiff was insane when the deed was executed, it is not a defence for the defendant to show that 'he was ignorant of the fact, and practised no imposition. The fairness of the defendant's conduct cannot supply the plaintiff's want of capacity.' *Seaver* v. *Phelps,* 11 Pick. 304, 305." There are other courts that take this view of the law.

Judge Story, in his great work on Equity Jurispru-

dence (14 ed., §§ 317, 318), makes the following comment on the law which should govern the cancellation of contracts of persons *non compos mentis:* "The ground upon which courts of equity now interfere to set aside the contracts and other acts, however solemn, of persons who are idiots, lunatics, and otherwise non compotes mentis, is fraud. Such persons being incapable in point of capacity to enter into any valid contract or to do any valid act, every person dealing with them, knowing their incapacity, is deemed to perpetrate a meditated fraud upon them and their rights. And surely if there be a single case in which all the ingredients proper to constitute a genuine fraud are to be found, it must be a case where these unfortunate persons are the victims of the cunning, the avarice, and corrupt influence of those who would make an inhuman profit from their calamities. Even courts of law now lend an indulgent ear to cases of defence against contracts of this nature, and if the fraud is made out will declare them invalid" (§ 317). "But courts of equity deal with the subject upon the most enlightened principles, and watch with the most jealous care every attempt to deal with persons non compotes mentis. Wherever from the nature of the transaction there is not evidence of entire good faith (uberrimae fidei); or the contract or other act is not seen to be just in itself or for the benefit of these persons, courts of equity will set it aside or make it subservient to their just rights and interests. Where indeed a contract is entered into with good faith and is for the benefit of such persons, such as for necessaries, there courts of equity will uphold it as well as courts of law. And so if a purchase is made in good faith without any knowledge of the incapacity, and no advantage has been taken of the party, courts of equity will not interfere to set aside the contract if injustice will thereby be done to the other side, and the parties cannot be placed in statu quo, or in the

state in which they were before the purchase" (§ 318).

In *Clay* v. *Clay's Committee*, 179 Ky. 494, 495, 496, the court said: "It has been decided in this state and elsewhere, over and again, that the deed of a person of unsound mind, especially before he has been adjudged a lunatic, is not void but is voidable only. * ·* * The mere fact of insanity, even when clearly proved, is not sufficient ground upon which to authorize a court of equity to set aside a deed; but there must, in addition, exist some other equitable grounds warranting the cancellation. If the price is adequate and the transaction fair, neither the insane grantor nor his committee has an absolute right to have the conveyance cancelled; and only when there is injustice or inequity will a court of equity be authorized or justified in interposing to annul a transaction and to restore the parties to the *statu quo ante*. Unless the grantor, by reason of his insanity or imbecility, has been imposed upon and has suffered some injustice, no reason exists for the cancellation of the deed; and without reason therefor the transaction cannot be disturbed." In *Matthiessen & Weicherns* v. *McMahon's Administrator*, 38 N. J. L. 536, it is said in the syllabus: "The general rule is that contracts with lunatics and insane persons are invalid, subject to the qualification that a contract made in good faith with a lunatic for a full consideration, which has been executed without knowledge of the insanity or such information as would lead a prudent person to a belief of the insanity, will be sustained." In *Scott* v. *Hay*, 90 Minn. 304, 313, the court said: "It must be further held, on this contention, to be the recognized doctrine that where a contract with a person of unsound mind has been entered into in good faith, for a fair consideration, as found by the court here, without notice of anything that would put a prudent person upon inquiry of the infirmity, and has been so far performed that the parties cannot be replaced in

their previous condition, it cannot be avoided. The rule has been thus stated by Baron Pollock in *Molton* v. *Camroux,* 2 Exch. 487, 502: 'We are not disposed to lay down so general a proposition as that all executed contracts bona fide entered into must be taken as valid, though one of the parties be of unsound mind. We think, however, that we may safely conclude that when a person apparently of sound mind, and not known to be otherwise, enters into a contract for the purchase of property, which is fair and bona fide, and which is executed and completed, and the property, the subject-matter of the contract, has been paid for and fully enjoyed, and cannot be restored so as to put the parties in statu quo, such contract cannot afterwards be set aside by the alleged lunatic or those who represent him.' " It is said in 2 Pomeroy's Equity Jurisprudence 2010 (§ 946): "In general, a lunatic, idiot, or person completely *non compos mentis* is incapable of giving a true consent in equity, as at law; his conveyance or contract is invalid, and will generally be set aside. While this rule is generally true, the *mere* fact that a party to an agreement was a lunatic will not operate as a defense to its enforcement, or as ground for its cancellation. A contract executed or executory made with a lunatic in good faith, without any advantage taken of his position, and *for his own benefit,* is valid both in equity and at law. And where a conveyance or contract is made in ignorance of the insanity, with no advantage taken, and with perfect good faith, a court of equity will not set it aside, if the parties cannot be restored to their original position, and injustice would be done." There are many other authorities of high rank which announce the same view of the law.

After much reading and careful thought, we believe the rule that the deed of a grantor who was mentally incompetent to execute it, but whose condition prior to its

execution had not been judicially declared and which in contemplation of law was not otherwise known to those dealing with such incompetent, is voidable only, is more strongly supported by reason and justice than the harsher rule that such deed is absolutely and unconditionally void. We also believe that it is in accordance with sound principles of equity and the highest standards of justice to say that such deed, when judicially attacked, should not be canceled upon the sole ground that the grantor was mentally incompetent but that in determining whether it should be canceled the nature of the transaction in all its aspects and the good or bad faith of those dealing with the grantor in respect to such transaction should be carefully considered. In other words, if under recognized principles of equity it would work injustice to the Waialua company to cancel the deed but would work no injustice to Eliza Christian to permit it to remain unmolested, the cancellation should be refused. On the other hand, if it would work no injustice to the Waialua company to cancel it but would be unjust to Eliza Christian to refuse to cancel it, the deed should be canceled. When the grantee can be restored to the position it occupied immediately prior to the conveyance, the deed of the incompetent should be canceled even though it was taken in ignorance of the incompetency and even though the consideration paid was adequate. When, in addition to the foregoing, it is found that in reality the conveyance was not for the benefit of the incompetent and that the grantor did not receive the consideration paid by the grantee, the case for cancellation is made even stronger.

In deciding whether cancellation would work injustice to the Waialua company we must consider whether it can be restored to the position it occupied immediately before it received Eliza's deed. If it can be restored to that position no injustice will be done it by the cancellation and

Eliza's right to cancellation becomes absolute without re-gard to the Waialua company's good or bad faith. Having dealt with an imbecile, although in ignorance of her condition, the Waialua company cannot hold her to her bargain on the sole ground that it acted in good faith if upon her release from it the Waialua company's *status quo* can be restored. That is to say, if when the deed is canceled the Waialua company is left no worse off than it was before the deed was made it suffers no injustice by the cancellation. Of course it cannot claim that it would be worse off because it would be obliged to surrender an interest in land which, from natural causes, such as a greater and more profitable development of the sugar industry, a larger and more competitive market and the acquisition by Eliza of the fee simple estate, had largely increased in value. Certainly it would lose the benefit of this increment, but this would be no impediment recognized by law to its restoration to its *status quo ante*. The increment would be to Eliza's property and the loss to the Waialua company would be of something which in equity never belonged to it.

It must be remembered that Eliza's deed was inoperative as a binding divestiture of her contingent interest or of the larger prospective interest which later matured into a fee simple estate. If there is no equitable reason why she cannot now claim her interest, she is entitled to it notwithstanding its present worth by natural increment has grown to be much greater than it was when she signed the deed of May 2, 1910. Take, for instance, the case of a vendee of land who seeks to rescind a contract of purchase and sale on some ground recognized by equity, it certainly would be no defense for the vendor to say that the land from purely natural causes had depreciated in value and therefore he could not be restored to his original position. In *Dickerson* v. *Morse*, 203 Ia. 480, 483, 484, the court,

speaking on this subject, said: "We may take judicial notice of the fact of the general depreciation in land values since March 1, 1920, but we are not ready to hold that a depreciation in the market value of real estate constitutes a defense to the instant action. A substantial restoration is all that in any event is required. The right to rescind does not depend upon plaintiff's ability to make the adverse party whole in a pecuniary sense as to the real estate conveyed. The *status quo* depends upon returning to defendant what plaintiff has received. * * * The market depreciation of the land is not a matter affecting the right of rescission." In 9 C. J. 1212 (§ 101) the rule is stated as follows: "It is no objection to a restoration of property received on a fraudulent sale that it has fallen in value since the date of the transaction. To entitle a defrauded purchaser to rescission he must do equity, but it does not follow that he must be able to return the property in the condition in which he received it. So if the property is of a perishable nature the holder is not bound to keep it in a state of preservation until the bill is filed. And, when the property is lost in whole or in part, through some inherent defect that existed at the time of its conveyance, plaintiff is called on to restore only what he can." In *Neblett* v. *Macfarland*, 92 U. S. 101, 104, the court said: "It is no objection to a restoration of property received on a fraudulent sale that it has fallen in value since the date of the transaction."

The converse of this must be equally true. If the vendor sought rescission on some sound equitable principle, his suit being otherwise meritorious, he certainly would not fail merely because the land from natural causes had increased in value and therefore it would be a disappointment to the vendee to be obliged to give it up. Restoration to the *status quo* is not prevented by such changes in value. If, however, valuable and irremov-

able improvements are placed on the land in the justified belief that he who placed them there is the owner of the land and there is no way by which he can be compensated for them, a different question arises.

It is contended by the Waialua company that its *status quo* cannot be restored because during the time that intervened between Eliza's deed and the commencement of this suit it, in perfect good faith, erected permanent improvements on the land at the aggregate cost of approximately $425,000. These improvements consist for the most part of pumps, railroads, buildings, reservoirs, ditches, waterways, roads, bridges, fences and an electric plant. They are all parts of an equipment necessary to the profitable cultivation of the land, which is adapted to and used for the raising of sugar cane. If there is no legal method available to the Waialua company under which it can be adequately compensated for the improvements there would be force in this contention. If there is such a method, however, the contention cannot be sustained for the evident reason that the Waialua company's rights, in so far as they relate to the improvements, can be fully protected.

It appears from the evidence that at the time Eliza's deed was signed the Waialua company already owned in fee practically an undivided two-thirds interest in the lands in question. If the deed is canceled and Eliza's interest is thus restored to her she and the Waialua company will become co-owners of the land as tenants in common. The Waialua company could then by a suit in equity institute proceedings to have the land partitioned. In such a suit a court of equity in decreeing partition would have ample power to do full justice between the parties. Section 2767, R. L. 1925, which relates to the powers of the court in partition suits, is as follows: "The court shall have power to hear, investigate and determine any and all questions of conflicting or controverted titles or

claims either as to the whole of the property or as to any share or interest therein, either with or without the intervention of a jury, as hereinafter provided; to remove clouds upon the title of the property or any share or interest therein; to vest titles by decrees, without the form or necessity of conveyance by minors or unknown or absent owners; to cause the property to be equitably divided between the parties according to their respective proportionate interests therein, as the parties shall agree, or by the drawing of lots; to set apart any particular portion or portions of land to any particular party or parties who by prior occupation or improvement or otherwise may be equitably entitled thereto, and make any proper adjustment or equalization thereof by the sale of other portions and the application of the proceeds for such purpose, or as a condition of any such particular allotment to require payment by such parties of any value of the portion so set apart to them in excess of their proportionate interest in the value of the whole property; to divide and allot portions of the premises to some or all of the parties and order a sale of the remainder, or to sell the whole thereof, where for any reason the partition thereof in kind would be impracticable in whole or in part or be greatly prejudicial to the parties interested, and by decree or decrees to invest the purchaser or purchasers with title to any property sold, and use the proceeds to equalize the general partition. When partition of two or more separate tracts or parcels of land is sought, the whole share of any party in all of them may be set apart to him in any one or more of the tracts or parcels."

This statute is but an expression of the powers which courts of equity have always had. These powers include that of securing, in one of several ways, compensation to a cotenant who has placed improvements on the land, adopting of course the method which will most clearly do

justice to all concerned. For instance, .the court may award in severalty to the improving ·tenant that part or those parts of the common property upon which the improvements are located. If this method is feasible it gives to such cotenant all that his money and efforts have produced. At the same time it takes from the other cotenants nothing to which they are entitled or which had been produced either by their money or labor. If because of the area, location or nature of the lands this method cannot be justly employed, another method that may be adopted is to ascertain the cost or value of the improvements, sell the common property and deduct for the improving tenant the sum of money representing the improvements and then divide the remainder among the cotenants according to their fractional ownerships. It is also permissible, under some circumstances, to use one of these methods as to a part of the land and the improvements and the other method as to the remainder of the land and ·the improvements. Still another authorized method which courts have sometimes found equitable is to require the other cotenants to pay to the improving cotenant the cost of moving the improvements to the portion or portions of land set apart to the tenant who has constructed the improvements, or to other lands owned by him outside the boundaries of the common property, where such improvements can be profitably used. This does not at all exhaust the methods by which the equities of cotenants may be adjusted in a partition suit. The methods we have mentioned are not intended as even a suggestion of what should be done in a suit to partition the Holt lands, but merely to illustrate the broad powers courts have in suits of that kind.

We are not at liberty under the pleadings and the evidence before us to adopt any of the methods that would be appropriate in a partition suit. Since, however, such a suit will be available to the Waialua company the improve-

ments which it placed upon the land do not constitute an obstacle to its restoration to its *status quo*. In order to restore the Waialua company to its *status quo*, the sum of $30,000, the consideration paid for Eliza's interest, together with interest thereon, must be returned or secured to it. There is an absolute offer in the petition to make this restitution. How it is to be made will be considered later.

Eliza's *status quo* will be automatically restored upon cancellation of her deed. She will then occupy the position she would have occupied if the deed had never been signed by her. That is, she will be the owner in fee of an undivided one-third interest in the land.

There are other considerations which confirm us in the view that it would be inequitable to permit the deed in question to remain uncanceled. One of these is that we believe from the evidence that Eliza never received the money that was paid for her interest. Another is that we also believe from the evidence that the disposal of her interest was not for her benefit.

Of the persons who were present at the American consulate when Eliza's deed was signed we have only the testimony of Annie Kentwell as to what occurred. When asked for her recollection as to the delivery of any check at that time she said: "As far as I can remember I think Mr. Withington gave the cheque to my husband but I am not quite sure; he may have given it to Mr. Holt, I am not sure." When asked if there was one check or more than one she said: "I cannot say. I cannot remember that." The witness was asked this question: "I will ask you, Mrs. Kentwell, so far as the monies recited as having been paid in the document of May 2, 1910, the recitation there being that the sum of 35,000 dollars was paid, has Mrs. Christian to the best of your knowledge ever received that sum or any portion of that sum?" to which she answered,

"No." When asked whether to her knowledge Eliza Holt Christian, at the time the deed was signed, had any banking account in Oxford or anywhere else, she answered: "She did not," and when asked whether to her knowledge Eliza received any sum of money at that time personally, the witness answered: "No, she did not receive any." The witness also said that so far as she knew Eliza had not had any sum of money since the execution of the deed other than a few shillings she might have had for making purchases.

There is no apparent reason for disbelieving this testimony. On the contrary it is so strongly corroborated by other circumstances as to be convincing. It is evident that the dominant influence in Eliza's affairs was Lawrence Kentwell, a man of considerable business experience and an educated lawyer. All of the negotiations for the sale of Eliza's interest in the Holt lands were carried on and concluded with him. When Henry Holmes went to Oxford to close the option on the Makaha lands most of his consultations were with Kentwell and when the money was paid it was paid to him. Our belief from the evidence is that Eliza was so mentally incompetent that she was incapable of the least appreciation of the value of money or of dealing in any way with a bank, either in the deposit or withdrawal of money. The weight of the evidence is entirely in accord with this view. The conclusion, therefore, that it was not Eliza but Kentwell who received the money paid for her interest in the Holt lands seems inescapable. If it was paid to her whatever became of it? According to Annie Kentwell she never had a bank account and never had any money except very small change. There is no evidence that when a receiver was appointed for her in England any such sum as $30,000 was turned over to him. We think it by no means a strained inference

that the money was also used by Lawrence Kentwell for his own purpose.

That it was not beneficial to Eliza to dispose of her interest at the time the deed was signed is obvious. She was then living with her father and the Kentwells at the home of the latter in Oxford. Her life, because of her imbecile condition, was very restricted and her wants were accordingly simple. There was no necessity for her to have more than enough money to supply them. Annie Kentwell, by the instrument of August 31, 1906, to which we have already referred, had undertaken to support Eliza during her life. She was in no danger, therefore, of becoming a public charge or of not being supplied with the things necessary to her sustenance and comfort. In her circumstances it would clearly be the part of wisdom to hold on to her contingent interest when by doing so she might eventually become the owner of a vested and more valuable interest. It was certainly of no benefit to her to exchange her interest for a sum of money which she did not need and which she herself did not receive.

It is contended on behalf of the petitioner that there are other reasons why the deed should be canceled. One of these reasons is that in taking the deed from James L. Holt to Eliza's interest the Waialua company violated what was then a provision of section 55 of the Organic Act. The provision was as follows: "That no corporation, domestic or foreign, shall acquire and hold real estate in Hawaii in excess of one thousand acres; and all real estate acquired or held by such corporation or association contrary hereto shall be forfeited and escheat to the United States *. * *." This provision evidently was intended to place a restriction upon the power of corporations to acquire lands in the Territory and was for the protection of the public and not for that of individual grantors. The penalty for a violation of the provision is not

the reversion of the lands to the grantor, but their escheat to the United States Government. We think, therefore, that the petitioner can claim no advantage from the violation of the Organic Act complained of.

Another reason assigned for the cancellation of the deed is that the consideration was inadequate. We cannot agree with this. At the time the deed was signed Eliza's interest was entirely contingent. Whether it ever ripened into an absolute interest depended on her survivorship of her father who was the life tenant. If she predeceased him the fee simple interest upon his death would vest in his heirs at law then living. In this event the Waialua company would get nothing by its deed nor would it be able to recover the consideration which it had paid. Because of Eliza's imbecility and her inability to take the care of herself which a person of normal mind would be able to take, her life was encompassed by many hazards to which the life of a normal person is not exposed. It is very doubtful whether any reliable insurance company would have issued a policy on her life. During the negotiations for the purchase of her interest there was some talk of procuring such a policy but this was abandoned. At the time the deed was signed Eliza's father was seventy-one years of age, and while it was unlikely that he would marry and beget other children, it was not beyond the range of probability that he would adopt children who under the law would also become his heirs. Even, therefore, if Eliza survived him there might be other heirs with whom the fee simple estate would have to be shared. In this event Eliza's interest would be correspondingly diminished, and what the Waialua company obtained from her would to the same extent be diminished. In 1918 John D. Holt did endeavor to adopt the Kentwell children—six in number—and his effort failed solely for the reason that

the proceedings were not in accordance with Hawaiian statutes.

While the Waialua company was negotiating for the purchase of Eliza's interest, L. L. McCandless, a man of large financial means and an experienced dealer in agricultural lands in this community, was also endeavoring to purchase it. It is inferable from the evidence that he knew of the Waialua company's activities and also knew what it had offered. Notwithstanding this he offered the same amount and at no time was his offer increased. This is a strong indication that McCandless considered $30,000 to be all Eliza's interest was then worth. It appears from the testimony of James L. Holt that as far back as 1908 Lawrence Kentwell was trying to dispose of Eliza's interest and there is no evidence that at any time more than $30,000 was offered for it. Prior sales of undivided interests in these same Holt lands tend to show a market value of not exceeding $30,000 for a one-third contingent interest. The trial judge, by the application of certain mathematical formulae based on mortuary tables, reached the conclusion that her interest was worth $71,778.20. The problem that confronted the Waialua company was not, however, a mathematical problem but a human problem. Its purchase of her interest was a speculation that might or might not turn out to its advantage, according to subsequent events. If nothing transpired to destroy or diminish it the Waialua company would be the gainer, but if its hopes in that regard were disappointed by Eliza's predecease of her father or the coming into existence of other heirs, it would be the loser. The success of its speculation could not be predicated upon any mathematical formula.

It may be safe enough for well-managed insurance companies to base their estimates of risk on mortuary tables because in the long run, according to the law of averages, their gains exceed their losses. In a single transaction,

however, where the value of a contingent interest in land is to be determined, such tables are by no means a dependable criterion. *Tynte* v. *Hodge,* 13 Week. Rep. 172, involved the valuation of a reversion. The actuaries' figures on the value of the reversion varied from £50,000 to £80,-000. Auctioneers, basing the value on market value, set it at from £25,000 to £28,000, the latter being the actual consideration paid. The court accepted the latter evidence, and dismissed the bill. The court said: "The calculations of actuaries founded on the average value of lives may, if adopted, work great injustice in a great variety of individual cases. The life in question may be an extraordinarily good or an extraordinarily bad one, which is likely to last beyond the usual time, or the contrary. How, then, can it be right to make a rule govern an individual case to which it may not at all apply? And to this let me add an observation that has occurred to me in reading this case over more than once, that when you are dealing with the question what a man should pay for an insurance or the like, averages are reasonable enough; but to a person who is to purchase a particular reversion, the average value of life is a very poor security. What answer is it to a man, who by the accidental termination of a life loses the whole of his property, to be told that the life ought to have lasted, and then he would have been quite safe? You cannot value property in that way, and it is easily seen how completely the evidence is mistaken on that ground. It may be said that the lender can guard himself by an assurance; but when you are talking of the value of the reversion of a man of forty-seven as against a life of sixty-eight, one sees at once what extraordinary fallacies may be introduced if you give heed to any such mode of calculating the value." See also *Humes* v. *United States,* 276 U. S. 487; *Vanderbilt* v. *Eidman,* 196 U. S. 480.

It is further claimed that James L. Holt, the nominal

grantee in the deed, received a secret profit from the transaction and that this is also a reason why it should be canceled. The chief justice finds from the evidence that James L. Holt did make such a profit and is of the opinion that this was inequitable and unjust to Eliza and therefore emphasizes the correctness of a decree of cancellation. The majority of the court, however, deem it unnecessary to pass upon this question.

It is contended by the Waialua company that in no event can Eliza's deed be canceled because for nearly twenty years after it was signed no legal steps were taken to have it set aside and that this constitutes laches on her part which debars her from the relief which is now sought in her behalf. It is also contended that she is barred by our statute of limitations.

That laches cannot be imputed to a person in the mental condition that Eliza Christian was in when she signed the deed is too well settled to require discussion. 21 C. J. 241, states the rule as follows: "Laches cannot be imputed to one of unsound mind; and mental affliction not wholly incapacitating plaintiff may excuse delay. A lunatic being under the protection of the court, a suit in his behalf is in time if brought promptly after the appointment of a committee or guardian, and is not barred by the laches of a next friend or others not legally chargeable with the protection of his rights. But a person must proceed with reasonable promptness after recovering his reason." Of course, if after the deed was signed Eliza had become of normal mind, it would have been necessary in order to escape the effect of laches for her to institute proceedings to have the deed canceled within a reasonable time after her disability was removed.

Regarding the contention that her suit is barred by our statute of limitations, it is argued that it being an action *in personam* the bar of six years fixed by section 2639, R. L.

1925, is applicable. This section provides that "the following actions shall be commenced within six years next after the cause of such action accrued, and not after * * *."

Assuming that the present action is included in the enumeration of those required to be brought within six years, we must consider whether in view of Eliza Christian's mental condition it was necessary to commence the instant suit within the period mentioned in the statute.

It is contended that this was necessary for the reason that section 2648, R. L. 1925, specifies the classes of persons to which the period of six years is not applicable. This section is as follows: "If any person entitled to bring any action in part 1 of this chapter specified (excepting actions against the high sheriff, sheriffs, or other officers) shall, at the time the cause of action accrued be, either, 1. Within the age of twenty years; or, 2. Insane; or, 3. Imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term of less than his natural life; such persons shall be at liberty to bring such actions within the respective times in said part 1 limited, after such disability is removed." Regarding this section it is argued that the word "insane," as it therein appears, should be given a narrow and technical meaning and that it should not be so construed as to include those whose mental condition is merely enfeebled, no matter to what extent they are thereby incapacitated. More specifically, the argument is that all classes of mental incompetents, except insane persons, are subject to the bar fixed by section 2639, and that Eliza, not being insane but merely feeble-minded, should have brought her action within the six-year period.

We are unwilling to adopt the meaning of the word "insane" which is sought to be attributed to it. Such meaning would place within the rigid prescription of section 2639 all classes of mental incompetents including

902

congenital imbeciles, incurable idiots and persons who from one cause or another are mentally incapable of comprehending the simplest transactions of life and would exclude from it only those who are technically insane. We believe the legislature never intended to perpetrate such an injustice but intended to use the word "insane" in its generic sense. In 32 C. J. 594 (§ 4), the author of the text says: "'Insanity' is a broad, comprehensive, and generic term, of ambiguous import, for all unsound and deranged conditions of the mind. It includes every species of organic mental derangement, whatever may be its source or cause, whether the mental condition is congenital, or the result of arrested mental development, or of the act of Providence, or of the party's own imprudence, or of religious excitement, or of physical disease, or of dissipation, or of old age, or of unknown causes, or whether it is personal or hereditary. And it ordinarily implies every degree of unsoundness of the mind, whether it is casual, temporary, or permanent, whether of a mild or violent form; and it includes not only that derangement of the mind, produced by disease of the brain, such as is recognized by law as a defense to crime, which is the sole product of it, but it may also embrace conditions of sub-verted reason, such as may be produced by intoxication. The word has been frequently used to designate all mental impairments and deficiencies formerly embraced in the terms 'idiocy,' 'lunacy,' and 'unsoundness of mind.'" Eliza Christian's disability not having been removed the statute of limitations never began to run against her and therefore when her suit was brought had not tolled.

For the foregoing reasons it is our conclusion that the deed of May 2, 1910, so far as it affects Eliza R. P. Christian's interest in the land described, should be canceled.

We come now to another phase of the case. As we have already indicated, the trial judge, in addition to decreeing

that the deed in question, so far as Eliza Christian is concerned, should be canceled, also decreed that the Waialua company should pay to her acting guardian the sum of $540,906.07 as and for rents from April 10, 1922, up to the date of the decree. The question arises as to whether a decree for rentals can be entered in the instant suit.

It is contended by the Waialua company that no such decree can be entered for the reason that on March 17, 1905, it took a lease on the Holt lands at Waialua at an annual rental of $9,000, in which lease Eliza R. P. Christian joined as a consenting party; that the term of this lease was twenty-five years, beginning April 1, 1905, and ending April 1, 1930; that by the pleadings in this case the validity of the lease was expressly excluded from the issues and therefore could not properly have been adjudicated by the court below and cannot be adjudicated by this court; that until the lease has been judicially determined to be invalid as to Eliza Christian the Waialua company's possession of her interest in the Holt lands from April 10, 1922, up to the date of the decree was presumably lawful and therefore it is not liable to her in this suit for rents during this period even though it should be held that her deed of May 2, 1910, was invalid.

We find in the petition the following allegation regarding the lease: "Relief in equity against said lease need not be and cannot be herein prayed for, respondent's sole claim of right to the said lands being now based upon the said deed of May 2, 1910, hereinafter referred to." In the Waialua company's answer we find the following reference to the lease: "It admits that relief from said lease cannot be prayed for in this action and alleges that relief cannot be granted from said lease in this action." It is clear from these quotations that the parties were in agreement that no relief against the lease was prayed for or could be granted Eliza in the pending suit. Whether the

lease should be held invalid was therefore excluded from the issues which the court was called upon to determine.

Unless the lease is absolutely void on its face or unless it had before its expiration (for the reasons presently to be considered) lost its force, we think the contention of the Waialua company must be sustained. If its invalidity depends solely on Eliza's mental incompetency at the time she signed it it is in the same category as the deed of May 2, 1910. That is to say, it is voidable and not absolutely void and therefore its effect, so far as Eliza is concerned, would, like the deed, have to be determined according to principles of equity. Since the Waialua company has not only not been confronted with this issue but has been specifically informed by the petition that no relief arising out of the invalidity of the lease will or can be prayed for in the pending suit it would manifestly be unfair to now decide against it the questions upon which the fate of the lease may ultimately depend.

In these circumstances it was error for the trial court to enter a decree against the Waialua company for rents and that portion of the decree must therefore be reversed.

The issue of whether the lease was invalid because of Eliza's mental condition was material to her right to recover rents and it should therefore have been presented by the pleadings and not excluded from them. Its omission and exclusion were perhaps induced by the petitioner's supposition that the only claim made by the Waialua company to Eliza's interest was predicated upon the deed of May 2, 1910. This was, however, a mistaken supposition for if the deed fell the Waialua company had a perfect right to claim that its possession was justified by the lease. It would be unjust, however, to hold that this cannot be now cured by amendment. Such amendment should in the interest of justice and a complete determination, in this suit, of the rights of the parties be allowed. For that

purpose the case should be remanded with proper instructions to the lower court.

It is contended on behalf of the petitioner that as to Eliza the absolute voidity of the lease appears from the lease itself and therefore it is no impediment to her recovery of rents in the instant suit. More specifically, the contention is that it appears from the lease that Eliza had only a contingent interest in the lands and therefore had nothing to demise and that she was not in privity with the lessors. The following cases are cited in support of this contention: *Standard Metallic Paint Co.* v. *Prince Mfg. Co.,* 19 Atl. (Pa.) 411; *Matlack* v. *Kline,* 216 S. W. (Mo.) 323; *Coakley* v. *Chamberlain,* 8 Abb. Pr. (N. S.) 37. These cases, however, are not in point for the reason that in none of them had the remaindermen joined in the lease or in any way assented to it. In *Gas, etc., Co.,* v. *Patterson,* 184 Pa. St., 364, 367, 368, the lessee had obtained a lease for a specific term from a life tenant. Upon the death of the life tenant he sought, in a suit against persons who at the time the lease was executed were contingent remaindermen but who upon his death became owners in fee of the demised premises, to have the lease canceled upon the ground that it was terminated by the death of the life tenant. The lease was signed not only by the life tenant but by the remaindermen and contained the following clause: "The said party of the first part hereby guarantees peaceable possession of the premises hereby leased during the term of this lease, and agrees and binds himself that if the said party of the second part should be legally dispossessed thereof, to pay and reimburse the said party of the second part for all improvements made upon the said demised premises by them. In holding that the lease was not terminated by the death of the life tenant, the court said: "In the absence of anything showing a different intention, we would be forced to the conclusion

that this lease terminated at the death of Alexander Mc-Clure. In this lease, however, we have the provision quoted in the foregoing findings of fact" (being the provision above quoted). "And we have also the further provision that 'all covenants herein bind executors, administrators and assigns,' which, while in itself and by itself, is of no special significance, but taken in connection with the other provisions quoted, there is shown plainly an intention of the parties, that if the said lessor, through his executors, administrators and assigns, should in any way secure the peaceable possession guaranteed, the lease would be binding upon the parties to the full end of the term thereof, and only in case of actual dispossession would the lessee be entitled to compensation for its improvements, and no other damages. The plaintiff claims it was dispossessed by operation of law, but it was not actually dispossessed, on the contrary all the parties interested have assured it peaceable possession for the full term of the lease, not asking any new or additional consideration, but only that it continue to perform the obligations of the lease to the end of the term thereof, as it seems plain, from the instrument itself, was the intention of the parties, provided it shall have the peaceable possession guaranteed to it." The bill was dismissed.

This case lays down a rule which we believe to be sound, namely, that when the owner of a contingent remainder in land joins in a lease made by the life tenant and the lease contains a guaranty of possession during its term it is not terminated by the death of the life tenant nor does his death affect the obligation of the lessee to remain in possession of the premises during the remainder of the term. The same rule should, of course, be applied when it is claimed by the former remainderman who had joined in the lease and who had guaranteed possession

under it that it was terminated by the death of the life tenant.

Moreover, it is the settled law in this jurisdiction and in many others that a contingent remainder is alienable. *Motors Co.* v. *Nalaielua, ante* 418. The prevailing rule is thus stated in 24 A. & E. Enc. L. 406: "On reason, therefore, in any case where the remainderman is not ascertained, but where there is a person in existence in whom the remainder would immediately vest on the present happening of the contingency or the present determination of the particular estate, such person has a possibility coupled with an interest which he may transfer to another, subject, of course, to the same contingency by which it is affected in his hands. And this view is amply supported by authority as well as reason." It would seem inconsistent to say that a contingent remainderman is bound by a conveyance of his interest but is not bound by his consent to a lease of it.

It is also contended on behalf of the petitioner that even if the lease imposed any obligation on Eliza that obligation was merged in the deed which she signed on May 2, 1910, and was therefore extinguished. We cannot agree with this. Of course, if the deed had been a valid conveyance there would have been no longer a necessity for the Waialua company to claim any rights, including that of possession, under the lease, but the deed, for the reasons we have already expressed, being invalid, the Waialua company's rights under the lease remain unaffected until it is canceled.

The Waialua company further claims that by the instrument of August 31, 1906, Eliza conveyed to Annie Kentwell her interest in the Holt lands during her (Eliza's) life and that by the deed of May 2, 1910, in which Annie Kentwell and her husband, Lawrence Kentwell, joined as grantors, this interest passed to James

L. Holt and by subsequent conveyance to the Waialua company and therefore its possession of Eliza's interest in the lands was lawful and no decree against it for rents can be entered in this suit. The instrument referred to is as follows:

"This indenture—made this 31st day of August, A. D. 1906, by and between—Eliza R. P. Christian—(the only child and heir of John Dominis Holt, the elder) of Honolulu, Island and County of Oahu, Territory of Hawaii, of the first part, and—Annie Holt Kentwell—of the same place, party of the second part.

"Witnesseth—Whereas the party of the first part has for many years last past been supported and maintained at the home of the party of the second part, and at the cost and expense of the said party of the second part, and

"Whereas—the said first party is the only child and heir of John Dominis Holt, the elder, being also a devisee under the will of R. W. Holt, deceased, and is entitled in expectancy to a certain undivided interest or moiety in certain lands situate at Waialua, Oahu, now leased to the Waialua Agricultural Company, Limited, by lease dated the 17th day of March, 1905, and recorded in the Hawaiian Registry of Deeds in Liber ...., Folio ...., and

"Whereas—by virtue of being such heir of John Dominis Holt, the elder, and such devisee under the will of R. W. Holt, deceased, aforesaid, she, the said party of the first part, shall upon the death of him, the said John Dominis Holt, the elder, be entitled to her share of the rents reserved in said lease aforesaid, which share of said rents aforesaid is now enjoyed by her father, the said John Dominis Holt, the elder, and

"Whereas—the party of the second part has agreed to support and to maintain the party of the first part for and during the period of the natural life of her, the said party of the first part,

"Now Therefore This Indenture Witnesseth—That the said—Eliza R. P. Christian—in consideration of the premises and of One Dollar to her in hand paid by—Annie Holt Kentwell—of Honolulu aforesaid, the receipt whereof is hereby duly confessed and acknowledged and for other and valuable consideration to the said—Eliza R. P. Christian—moving from said—Annie Holt Kentwell—, she, the said—Eliza R. P. Christian—, does hereby give, sell, assign, release, transfer and set over unto the said—Annie Holt Kentwell—, her heirs, executors and administrators, all her title and interest in and to any and all rents issues and profits to which she may hereafter be entitled or which may be due and payable to her by, through or under the lease to the Waialua Agricultural Company, Limited, dated the 17th day of March, 1905, and recorded in said Liber ...., Folio ...., or by virtue of being the only child of John Dominis Holt, the elder, and devisee under the will of R. W. Holt, deceased, together with all and every her right to demand, receive, collect and receipt for all such rents, issues and profits from whomsoever due during the term of the natural life of her, the said—Eliza R. P. Christian—.

"And—it is expressly agreed and understood between and by the parties hereto that the party of the second part shall support and maintain her, the party of the first part, for and during the natural life of said first part.

"And—it is further agreed and understood by and between the parties hereto that in case the party of the first part shall survive the party of the second part, the heirs of said second party shall be entitled to perform the covenant of this agreement on the part of said second party to be kept and performed, and they shall during the life of said first party be entitled to the benefit or benefits hereof."

On its face this instrument purports to be an assign-

ment of Eliza's interest in rents, issues and profits and if it is to be given any other interpretation it is because of the implication of law that such assignment is a conveyance of an interest in the land from which the rents, issues and profits are derivable. In *Hapai* v. *Brown,* 21 Haw. 499, 505, this court said: "A gift of the income or the rents, issues and profits of property is to be construed as a gift of the property itself unless from some language in the will it appears that the testator intended something different." This is a general rule of construction. See 2 Tiffany on Real Property § 441; *Beilstein* v. *Beilstein,* 194 Pa. St. 162; *Drusadow* v. *Wilde,* 63 Pa. St. 170.

It is contended on behalf of the petitioner that if this is the effect of the instrument it is void for the reason that Eliza had a husband living at the time she executed it and that he did not give his consent in writing as required by section 2993, R. L. 1925. This contention may be passed without decision for the reason that, assuming the instrument to be void as a conveyance of an interest in land, it is nevertheless valid as an assignment of rents. That rents due under an existing lease are severable from the reversion and may be assigned independently of the reversion is well settled. See *Kaleiheana* v. *Keahipaka,* 23 Haw. 169, 171. Nor did the provisions of section 2993 present any obstacle to the assignment of rents by Eliza independently of the written consent of her husband. The only restriction placed upon her power to deal with her separate property was that she could not sell or mortgage her real estate without his written consent. In other respects she could deal with it as if she were a feme sole.

Laying aside for the moment the question of whether Eliza was mentally competent to bind herself by this instrument and treating its execution as the act of a mentally competent person it must be assumed that the object she sought to accomplish by it was to provide compensa-

tion to Annie Kentwell for her agreement to support Eliza during the latter's life. It must also be assumed that she intended to execute a valid instrument and not one that was invalid. If the instrument which she executed would be ineffectual as a conveyance of her interest in the land but would be effectual as an assignment of rents it should be given the construction which would accomplish Eliza's purpose and not that which would defeat it.

Because of the deed of May 2, 1910, in which Annie Kentwell and her husband, Lawrence Kentwell, joined as grantors, and by which they made a full and complete conveyance of all their interest in the Holt lands, including all claims and demands arising out of the lease of 1905, the instrument of 1906, which we have just been considering, unless hereafter set aside because of Eliza's mental incompetency, is a protection to the Waialua company against the payment to any one of the rents that accrued under the lease. The Waialua company's liability for rents since the termination of the lease is not involved in this suit.

Whether the instrument of 1906 should be set aside because of Eliza Christian's mental incompetency is not within the issues presented by the pleadings. It should, however, if the petitioner wishes to do so, be made an issue by amendment and the court below will be so instructed.

The decree appealed from, in so far as it relates to the cancellation of the deed of May 2, 1910, is affirmed and the Waialua Agricultural Company will be required to reconvey to Eliza R. P. Christian all of the interest which it has acquired from her under and by virtue of that deed upon her payment to the Waialua Agricultural Company of the sum of $30,000 with interest at six per cent per annum from May 2, 1910, to the date of the decree of this court, or upon her assuring to the Waialua Agricultural Company the payment of said sum together with interest

by a mortgage upon the interest so reconveyed or in any other satisfactory manner. So far as it requires the Waialua Agricultural Company to pay to the guardian of Eliza R. P. Christian the sum of $540,906.07 because and on account of rents the decree appealed from is reversed and the case is remanded to the circuit judge with instructions to permit amendments to the pleadings which will serve to put in issue the validity of the lease of 1905 in so far as it may be affected by the mental condition of Eliza R. P. Christian and also to permit amendments to the pleadings which will serve to put in issue the validity of the written instrument of August 31, 1906, so far as it may be affected by Eliza's mental condition and to receive all evidence that may be offered which is material to these issues and to determine whether the lease and the instrument of 1906 were ineffective because of Eliza's mental incapacity and also to determine the question, consistently with such conclusions as may be reached on the issue of the validity of the two instruments and consistently also with the views and findings of this court, of whether the petitioner is entitled to recover against the Waialua Agricultural Company anything by way of rents and damages. An interlocutory decree in conformity with these conclusions will be signed upon presentation.

*Barry S. Ulrich* (*Ulrich & Hite* on the briefs) for petitioner.

*A. L. Castle* and *H. Phleger* (*Brobeck, Phleger & Harrison* and *Robertson & Castle* on the briefs) for respondent Waialua Agr. Co.